1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**
HELEN I. ZELDES (SBN 220051)
*hzeldes@sshhzlaw.com*
AMY JOHNSGARD (SBN 279795)
*ajohnsgard@sshhzlaw.com*
501 W. Broadway, Suite 800
San Diego, CA 92101
Tel: (619) 400-4990

*Counsel for Plaintiffs and the Proposed Class.*
*[Additional Counsel on Following Page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## DIVISION

| | |
|---|---|
| SHADI KRANITZ, an individual; and DR. SHADI CONCIERGE MEDSPA, a California Corporation; NICOLE KING, an individual; COSMO CONTOUR & SPA LLC, a California limited liability company; JENNIFER TABIZA, an individual; JENNIFER TABIZA OPTOMETRIST, APC, a California professional corporation, *on behalf of themselves and all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> BTL Industries, Inc., a Delaware Corporation; MMP CAPITAL, INC., a New York Corporation; DEXT CAPITAL, LLC, a Delaware limited liability company; TIMEPAYMENT CORP., a Delaware Corporation; NORTH MILL CREDIT TRUST, a Delaware Association; AMUR EQUIPMENT FINANCE, INC., a Nebraska corporation; and DOES 1-10, inclusive, <br><br> Defendants. | Civil Case No.: 8:25-cv-1587-DOC-JDE <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> *[SEEKS STATEWIDE OR NATIONWIDE RELIEF]* <br><br> **DEMAND FOR JURY TRIAL** |

**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**
JOSHUA A. FIELDS (SBN 242938)
*jfields@sshhzlaw.com*
9415 Culver Blvd., #115
Culver City, CA 90232-2616
Tel: (619) 400-4990

**HAINES LAW GROUP, APC**
Paul K. Haines (SBN 248226)
*phaines@haineslawgroup.com*
Fletcher W. Schmidt (SBN 286462)
*fschmidt@haineslawgroup.com*
Ian T. Mallery (SBN 359132)
*imallery@haineslawgroup.com*
2155 Campus Drive, Suite 180
El Segundo, California 90245
Tel: (424) 292-2350
Fax: (424) 292-2355

*Attorneys for Plaintiffs and the Proposed Class.*

Plaintiffs Nicole King, Cosmo Contour & Spa LLC,  Jennifer Tabiza, Jennifer Tabiza Optometrist, APC, Shadi Kranitz, and Dr. Shadi Concierge Medspa (together, "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their counsel, bring the following Complaint against Defendants BTL Industries, Inc. ("BTL"), MMP Capital, Inc. ("MMP"), Dext Capital, LLC ("DEXT"), Timepayment Corp. ("TIMEPAYMENT"); North Mill Credit Trust ("NORTH MILL"); Amur Equipment Finance, Inc. ("AMUR") and DOES 1-10 (collectively referred to herein as "Defendants").

## NATURE OF THE ACTION

1.     Plaintiffs bring this action individually, and on behalf of all other similarly situated purchasers of cosmetic medical devices produced, sold, and/or financed by Defendants, who were induced through Defendants' false pretenses to enter fraudulent, misleading and deceptive sales and financing agreements with the Defendants to purchase cosmetic medical devices.

2.     This class action arises from Defendant BTL's fraudulent, deceptive and exploitative marketing and sales practices in the medical aesthetics industry, a highly unregulated market. The medical aesthetics industry has grown exponentially in recent years, with aesthetic medical device manufacturers aggressively marketing their products to physicians, med spa owners, and other healthcare professionals as lucrative revenue-generating tools.

3.     Defendant BTL marketed these devices as profitable devices promising high revenues, that came with marketing and advertising support to purchasers that would generate leads, but failed to provide such support.

4.     Defendant BTL facilitated financing through third party lenders, including Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR, inducing Plaintiffs through false pretenses to enter high-interest financing agreements amassing hundreds of thousands of dollars of debt.

5.     Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR knew or should have known that BTL was supplying them with falsified or otherwise grossly inaccurate data and financial documents in order to secure loans for Plaintiffs and the Class Members. Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR also knew or should have known that the terms of these loans were materially misrepresented to Plaintiffs at the time they were signed.

6.     Defendant BTL lures doctors, nurses, and medical spa owners into financing their cosmetic medical devices by "wining and dining" them at extravagant sales conferences, over-inflating, or blatantly misrepresenting potential sales projections for treatments they can then sell to their clients.

7.     Defendant BTL promised post-purchase marketing support to drive sales to Plaintiffs' businesses, including business-tailored billboard advertisements, promotional videos, online advertising, and sales referrals. The support that was actually provided, however, fell far short of what Defendant BTL had promised.

8.     In March 2025, BTL boasted of becoming the "fastest-growing non-invasive facial lifting procedure" when its EMFACE treatment surpassed one million treatments administered in just two years.[1]

9.     Defendant BTL's growth in four short years is marked, with upwards of 3,000 employees, 500+ engineers and a presence in over 80 countries. This growth hinges in large part on Defendant BTL convincing small business owners of boutique clinics, or medical spas, like Plaintiffs to often finance six figure, high-interest loans to purchase its devices such as EMFACE, EMSCULPT NEO, EMSELLA, and others.

/ / /

/ / /

---

[1] https://www.prnewswire.com/news-releases/btls-emface-surpasses-1-million-treatments-becoming-the-fastest-growing-non-invasive-facial-lifting-procedure-302390226.html?utm_

10.     Defendant BTL maintains an aggressive marketing and sales campaign including extravagant luxury trips all over the world, targeted toward Plaintiffs and those similarly situated.

11.     Defendant BTL intentionally communicated and agreed to "terms of the agreement," primarily verbally, and often refused to document commitments in emails or other writings.

12.     Defendant BTL funneled Plaintiffs and putative class members to select financing companies including Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR, who also facilitated the high-interest loans.  Like these other questionable and unlawful business practices, Defendant BTL's fraudulent, misleading and deceptive sales practices allow it to take advantage of practitioners who, after being fraudulently induced by Defendants to purchase BTL devices, become burdened with crippling, business-shuttering debt.

13.     Plaintiffs thus bring this action pursuant to: (i) California's Business & Professions Code §§ 17200, *et seq.* (the Unfair Competition Law or "UCL"); (ii) California's Business and Professions Code §§ 17500, *et seq.* (the False Advertising Law or "FAL"); (iii) California's Business & Professions Code §§ 16700, *et seq.* (the Cartwright Act), and common law claims described herein. Plaintiffs bring this action on behalf of a nationwide class and a California subclass for damages, restitution, and injunctive relief, and any other relief deemed appropriate by the court to which this case is assigned.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d), as there is minimal diversity, there are over 100 class members, and the amount in controversy exceeds the sum of $5 million, exclusive of interest and costs.

15.     This Court has personal jurisdiction over Defendants because Defendants are corporations, limited liability companies, or other business entities

1    authorized to conduct and who do conduct business in the State of California.

2    Defendants conduct sufficient business with sufficient minimum contacts in

3    California, and/or otherwise intentionally avail themselves of the California market

4    through their promotion, sales, distribution, marketing, and financing within this

5    State to render the exercise of jurisdiction by this Court permissible.

6        16.    Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendants

7    transact substantial business in this District. A substantial part of the events giving

8    rise to Plaintiffs' claims arose here.

9                                    **PARTIES**

10       17.    Plaintiff Nicole King, at all times mentioned herein was an individual

11   citizen of the State of California and resident of Los Angeles County. Plaintiff Cosmo

12   Contour & Spa LLC, at all times mentioned herein, was a California Limited Liability

13   Company with its principal place of business in Los Angeles County, and was owned

14   by Plaintiff Nicole King. On or about November, 2021, Plaintiff Nicole King, through

15   Plaintiff Cosmo Contour & Spa LLC, purchased BTL's "Emsculpt Neo" device, with

16   an equipment financing agreement through Defendant MMP, which was assigned to

17   Defendant AMUR two days later. On or about October 2022, Plaintiff Nicole King,

18   through Plaintiff Cosmo Contour & Spa LLC, purchased BTL's "Emface" device,

19   with an equipment financing agreement through DEXT. Although Plaintiff Cosmo

20   Contour & Spa LLC signed the purchase agreements, the purchase agreements

21   required Plaintiff Nicole King to personally guarantee the agreements. Defendants

22   induced these purchases through fraudulent, deceptive, and/or misleading statements,

23   representations, and/or omissions.

24       18.    Plaintiff Jennifer Tabiza, at all times mentioned herein was an individual

25   citizen of the State of California and resident of Los Angeles County. Plaintiff

26   Jennifer Tabiza Optometrist, APC, at all times mentioned herein, was a California

27   Professional Corporation, with its principal place of business in Los Angeles County,

28   and was owned by Plaintiff Jennifer Tabiza. Between October 2022 and December

---

FIRST AMENDED CLASS ACTION COMPLAINT

2022, Plaintiff Jennifer Tabiza, through Plaintiff Jennifer Tabiza Optometrist, APC, purchased BTL's "Emface," "Emsculpt Neo," "Emsella" and "Emtone" devices, with financing agreements through MMP for all devices except the Emsella, which was through TIMEPAYMENT. However, upon information and belief, MMP subsequently assigned the Emface financing agreement to DEXT, the Emsculpt Neo agreement to NORTH MILL, and the Emtone agreement to AMUR. Although it was Plaintiff Jennifer Tabiza Optometrist, APC that signed the purchase agreements, the purchase agreements required Plaintiff Jennifer Tabiza to personally guarantee the agreements. Defendants induced these purchases through fraudulent, deceptive, and/or misleading statements, representations, and/or omissions.

19.   Plaintiff Shadi Kranitz, at all times mentioned herein was an individual citizen of the state of California and resident of Orange County. Plaintiff Dr. Shadi Concierge Medspa, a California Corporation, at all times mentioned herein was a California Corporation, with its principal place of business in Orange County, and was owned by Plaintiff Shadi Kranitz. Between March 2023 and May 2023, Plaintiff Shadi Kranitz, through Plaintiff Dr. Shadi Concierge Medspa, purchased BTL's "Emface" and "Exion" devices, with financing through MMP. Eight days after the financing agreement for the Emface device was executed, MMP assigned the agreement to Defendant NORTH MILL. Ten days after the financing agreement for the Exion device was executed, MMP assigned the agreement to Defendant AMUR. Although it was Plaintiff Dr. Shadi Concierge Medspa that signed the purchase agreement, the agreement required Plaintiff Shadi Kranitz to personally guarantee the agreement. Defendants induced this purchase through fraudulent, deceptive, and/or misleading statements, representations and/or omissions.

20.   Defendant BTL  is a privately owned global manufacturer of medical and aesthetic equipment, namely Emsculpt Neo, Emsculpt Classic, Emface, Emsella, EmTone, Exion, and ExoMind devices. BTL is incorporated under the laws of Delaware, with its principal place of business in Massachusetts with offices located

at 362 Elm St, Ste #5, Marlborough, MA 01752 and thus is a citizen of Delaware and Massachusetts. BTL has engaged in business in the state of California by selling and delivering equipment to consumers throughout California, which it also does throughout the United States. BTL holds multiple U.S. patents covering its proprietary High-Intensity Focused Electromagnetic (HIFEM) technology, which is central to the Emsculpt Neo body-contouring device and other non-invasive body-shaping procedures. BTL has actively enforced its patent rights against competitors to protect its exclusive use of the patented technology. Although BTL's patents provide significant protection for its HIFEM technology, other companies may hold patents relating to alternative muscle-stimulation and body-contouring methods.

21. Defendant MMP is a privately owned financial services company specializing in equipment financing and unsecured capital financing. MMP is incorporated under the laws of New York with an office located at 19 Engineers Lane, Farmingdale, New York 11735 and thus is a citizen of New York. MMP has engaged in business in the state of California by entering into equipment finance agreements with purchasers of BTL devices throughout California, which it also does throughout the United States.

22. Defendant DEXT is a privately owned financial services company specializing in medical equipment financing. DEXT is organized under the laws of Delaware with an office located at 4000 Kruse Way Place, Building 3, Suite #100, Lake Oswego, Oregon 97035 and thus is a citizen of Oregon. DEXT has engaged in business in the state of California by entering into equipment finance agreements with purchasers of BTL devices throughout California, which it also does throughout the United States.

23. Defendant AMUR is a privately owned financial services company specializing in equipment financing. AMUR is organized under the laws of Nebraska with an office located at 304 W. 3rd Street, Grand Island, Nebraska 68801, and thus is a citizen of Nebraska. AMUR has engaged in business in the state of California by

1  entering into equipment finance agreements with purchasers of BTL devices
2  throughout California, which it also does throughout the United States.

3          24.    Defendant TIMEPAYMENT is a privately owned financial services
4  company specializing in equipment financing.  TIMEPAYMENT is organized under
5  the laws of Delaware with an office located at 200 Summit Drive, Suite #100,
6  Burlington, MA 01803 and thus is a citizen of Massachusetts.  TIMEPAYMENT has
7  engaged in business in the state of California by entering into equipment finance
8  agreements with purchasers of BTL devices throughout California, which it also does
9  throughout the United States.

10         25.    Defendant NORTH MILL is a Delaware association that engages in
11  equipment financing.  NORTH MILL is organized under the laws of Delaware with
12  an office located at 50 Washington Street, Suite 1211, South Norwalk, CT 06854 and
13  thus is a citizen of Connecticut.  NORTH MILL has engaged in business in the state
14  of California by entering into equipment finance agreements with purchasers of BTL
15  devices throughout California, which it also does throughout the United States.

16         26.    Plaintiffs do not know the true names or capacities, whether individual,
17  partner, or corporate, of the defendants sued herein as DOES 1 through 10, and for
18  that reason, said defendants are sued under such fictitious names, and Plaintiffs will
19  seek leave of this Court to amend this Complaint when such true names and capacities
20  are discovered. Plaintiffs are informed and believe, and based thereon allege, that
21  each of said fictitious defendants, whether individual, partner, or corporate, were
22  responsible in some manner for the acts and omissions alleged herein, and
23  proximately caused Plaintiffs to be subject to the unlawful practices, wrongs, injuries,
24  and damages complained of herein.

25         27.    Plaintiffs are informed and believe, and thereon allege, that all
26  Defendants, however designated whether by real or fictitious name, were and are in
27  some manner responsible for the events, happenings, occurrences and
28  instrumentalities upon and about which this action is made.

28.     Plaintiffs are further informed and believe, and thereon allege, that each of the Defendants herein, whether designated by real or fictitious name, are, and at all times relevant hereto, were, the agents of each of the co-Defendants, as well as the agents of all Defendants, and in doing things and acts herein alleged and complained of or in failing to that do that which they should have done, were acting within the scope of that agency.  Defendants, and each of them, approved of, condoned, and/or otherwise ratified each and every one of the acts or omissions alleged herein.

29.     At all times mentioned herein, Defendants, and each of them, were members of and engaged in a joint venture, partnership, and common enterprise, and were acting within the course and scope of and in pursuance of said joint venture, partnership, and common enterprise.

## **FACTUAL ALLEGATIONS**

30.     Between November 2021 and May 2023 Plaintiffs collectively purchased eight different devices from BTL, with a total purchase price in excess of $1.3 million dollars. Each of the eight devices was financed through third-party equipment financing companies exclusively arranged by BTL, including Defendants MMP, DEXT, NORTH MILL, TIMEPAYMENT, and AMUR, and after including the financing charges, the total commitment for the eight devices collectively was approximately $1.8 million dollars.

31.     BTL is a privately owned manufacturer of Medical and Aesthetic Equipment with the sole patent in the United States for the Emsculpt Neo body-contouring device and other non-invasive body-shaping devices and procedures, including Emsculpt Classic, Emface, Emsella, Emtone, Exomind, and Exion. The company actively restricts the importation of products into the United States that infringe BTL's patents; thus, BTL has a monopoly on these particular products in the United States.

32.     Defendant BTL, a major manufacturer of medical aesthetic devices, markets its devices as breakthrough technologies capable of generating substantial

revenue for medical practices and spas. Its flagship products, including Emsculpt Neo, Emsculpt Classic, Emface, Emsella, Emtone, Exomind, and Exion, are promoted as offering revolutionary treatment options that will significantly enhance purchaser revenue streams through increased patient demand, as well as geographically limited and price restricted markets. These market restrictions, imposed by BTL, allowed BTL to represent to potential purchasers that they would be able to sell treatments at inflated rates, which were rarely achievable in practice.

33.     Defendant BTL claims its devices are supported by extensive marketing assistance and guaranteed sales leads for purchasers, which are touted as essential components of the devices' profitability, in addition to territorial and price controls which are designed to regulate the supply and demand for the treatments.

34.     Manufacturers like Defendant BTL employ aggressive sales tactics designed to exploit potential customers. Medical professionals, including physicians and med spa owners with limited business experience are lured by Defendants' promises of high profitability, a protected market, and comprehensive marketing support that, in reality, are never delivered.

35.     The six-figure prices for these devices requires a large investment up front necessitating private financing, accruing high interest rates and other financing charges and the purchase of equipment protection insurance. The average med spa owner will invest in not just one device for one part of the body but several devices, sometimes amassing over half a million dollars in principal for financing in one agreement.

36.     Defendant BTL's sales strategy begins with broad marketing campaigns, promotional materials, and high-pressure in-person sales efforts. Sales representatives assure prospective customers that purchasing Defendant BTL's devices will result in substantial revenue increases for their businesses, and even promises of protecting their "corner on the market" in a particular geographic area, driven by Defendant BTL's purported marketing leads, advertising campaigns, and

patient referrals. These promises are made repeatedly in presentations, promotional materials, and verbal assurances by Defendant's representatives.

37.    Defendant BTL purposefully misleads potential purchasers based on inflated, misleading and/or fabricated usage and sales data for the devices.

38.    One of the tactics BTL employs is to use paid sales representatives who also own and operate medspas featuring BTL devices, without disclosing that the individuals are **paid salespeople**. BTL then funnels significant resources including promotion and client referrals to the medspas owned by the paid sales representatives, and then uses these success stories to sell potential clients on the profitability of the BTL devices. However, in reality, the medspa owners being promoted as success stories by BTL are being significantly propped up by additional support from BTL, not provided to other device purchasers, and by the commissions that they earn from sales of new devices.

39.    BTL's paid sales representatives are also paid to speak at sales events and conferences hosted by BTL, where they present PowerPoint presentations BTL created to promote the success of their spas without disclosing that they are being paid to promote BTL devices and that they will earn commissions on any devices sold at the sales events and conferences.

40.    For example, in approximately March 2023, Defendant BTL's Sales Representative Al Cervantes and Brad (last name presently unknown) took Plaintiff Kranitz to tour another medspa in Huntington Beach that featured BTL devices. However, the Huntington Beach medspa that Cervantes and Brad took Kranitz to tour was in fact owned by a paid nationwide sales representative for BTL who stood to earn a $5,000 commission on any BTL devices purchased by Kranitz, and this material fact was fraudulently concealed from Kranitz.

41.    Cervantes and Brad showed Kranitz fabricated or misleading sales data that indicated that the owner of the Huntington Beach medspa had increased her revenue from $60,000 per month to $4 million per year after purchasing BTL devices,

and Kranitz now believes this representation to be false. This data was generated by showing the usage statistics from the devices located at the Huntington Beach medspa, and representing that the treatments were all being sold at full price. However, in actuality, Defendant BTL, through its agents including Cervantes and Brad, were utilizing the Huntington Beach medspa as a BTL showroom, where they would frequently send interested purchasers, their staff, and their families to receive complimentary treatments, **completely free of charge**, and would compensate the owner of the Huntington Beach medspa with commissions on any devices sold as a result. This resulted in grossly inflated usage data that did not in any way indicate the true price consumers in the market would be willing to pay for these treaments nor the market potential of the devices. Defendant BTL was aware that these statistics were grossly inflated, but actively promoted the success of the Huntington Beach medspa as indicative of the market potential of the devices. Defendant BTL, through its agents including Cervantes and Brad, also included these inflated statistics in presentations that were presented at large sales conferences throughout the country.

42. Upon information and belief, Defendant BTL utilized this same tactic in other geographic markets throughout the country.

43. During the sales process, Plaintiffs primarily communicated with BTL representatives Dean Boyle, Vincent Perri, Louis Chambers, Al Cervantes, and Brad (last name presently unknown), who were at the time BTL's Area Sales Manager, Area Sales Director, Regional Sales Director, and Sales Representatives, all responsible for the territory that included Los Angeles and Orange Counties.

44. While BTL was attempting to persuade Plaintiffs into purchasing devices, its sales representatives made the same verbal representations to each of them: that BTL would provide substantial marketing and customer procurement support, and assured Plaintiffs that BTL possessed a substantial customer referral network that would be deployed for their benefit after purchase.

45.     For example, Dean Boyle verbally represented to Plaintiff Nicole King that BTL would provide a promotional billboard to promote her spa that was never provided. Although the representation was made verbally, this promise was referenced in a March 3, 2023 text message from Dean Boyle to Plaintiff Nicole King.

46.     Similarly, while inducing Plaintiff Kranitz to purchase the Emface device, BTL Sales Representatives Cervantes and Brad represented that Kranitz would receive six months of marketing and promotional support from Medvelocity Group and RepeatMD, and a custom promotional video. None of these services generated any revenue or results, falling far short of what had been promised. RepeatMD refused to provide services unless Plaintiff Kranitz agreed to commit to paying for services beyond the six-month introductory period, and when Plaintiff Kranitz declined to do so, RepeatMD ceased engagement. Despite BTL's representations, no contractual enforcement of RepeatMD's obligations was available to Plaintiff Kranitz. Medvelocity failed to ever produce a promotional video. Plaintiff Kranitz eventually contracted with a third party, at her own expense, to produce a video advertising the BTL treatments available at her Medspa.

47.     BTL representatives presented to Plaintiffs that their marketing and promotional support would manifest as "rebates," which Plaintiffs could "cash in" by seeking reimbursement from BTL after making advertising purchases. These rebates were often valued in excess of $25,000. Upon information and belief, Plaintiffs and similarly situated purchasers were rarely able to obtain reimbursement for the full amounts they were promised by BTL. However, Plaintiffs and other similarly situated purchasers were still caused to finance the value of these purported "rebates" as part of the total purchase price of the devices, thereby forcing Plaintiffs to pay increased interest and financing charges resulting from the increased principal value of the loan. Furthermore, this practice increased the disconnect between the true market value of the collateral and the amount being financed, effectively placing the purchaser

underwater from day one, and placing the purchaser at an increased risk of personal liability in the event of default.

48.    BTL representatives also made numerous representations to Plaintiffs that they would not be competing with other businesses utilizing BTL devices in their immediate vicinity, and sold Plaintiffs on a highly-controlled marketplace that would disallow competitors from undercutting them on pricing. However, these promises now appear to have been completely false and in fact there were numerous business competitors selling BTL treatments in Plaintiffs' direct geographic vicinities.

49.    For example, on approximately November 2021, Louis Chambers verbally represented to Plaintiff Nicole King that the Emsculpt Neo device would be sold only to a limited number of providers within her geographic area in order to minimize direct competition. Similarly, on approximately October 2022 when the Emface device was being launched, Louis Chambers verbally represented to Plaintiff Nicole King that Cosmo Contour & Spa LLC had been selected as one of only five providers in the geographic area to be given the opportunity to purchase the Emface device. However, neither of these representations were ultimately true.

50.    Similarly, on September 21, 2022, Vincent Perri and Louis Chambers met with Plaintiff Jennifer Tabiza, during which they verbally promised that BTL would provide promotional billboards, client leads, and other marketing support if she purchased BTL devices. During the meeting, Vincent Perri and Louis Chambers also showed Plaintiff Jennifer Tabiza sales and revenue data, purportedly showing how profitable the Emsella device had been for other providers. Plaintiff Jennifer Tabiza now believes that this sales and revenue data was inflated and/or fabricated.

51.    Similarly, in approximately March 2023, Sales Representative Cervantes and Brad emphasized to Plaintiff Kranitz that she would be the only owner of an Emface device in her geographic territory, which Kranitz relied upon in deciding to move forward with the purchase. However, this representation also turned out to be false.

52.   BTL delivered on only a fraction of the post-purchase support it promised, including failing to produce promotional billboards that were promised to Plaintiffs, and failing to follow through on promises to promote Plaintiffs' businesses in magazines. BTL also failed to deliver on its promises of customer referrals, which were essentially non-existent.

53.   By agreeing to purchase BTL devices, Plaintiffs were required to comply with a "Minimum Advertised Price" ("MAP") policy. Under this arrangement, BTL mandates that providers, including Plaintiffs, may not advertise BTL treatments below a fixed price point—believed to be uniformly enforced across the U.S. market. These pricing controls are embedded directly in BTL's purchase agreements, automatically binding purchasers to the MAP terms upon acquisition of the equipment.

54.   BTL's MAP policy applies to all BTL device purchasers, and is used to artificially control downstream retail pricing.

55.   Under the MAP pricing system, purchasers are prohibited from advertising or promoting treatment sessions below a specified amount—e.g., $850 per session. This was billed as an advantage to Plaintiffs because it would apply to any competitors offering the same treatments, and would ensure that revenues remained commensurate with their projections. However, in practice, Plaintiffs found that the MAP rules appeared to be selectively enforced, and many competitors were selling the same or similar treatments at a fraction of the cost that BTL set in the MAP guidelines. These limitations significantly impaired Plaintiffs' ability to offer competitive pricing in their local market and restrict lawful price-based competition.

56.   In addition, continued operation of the devices is conditioned on the provider's purchase of costly proprietary consumables from BTL. Should a provider deviate from the MAP pricing—such as by advertising discounts—Defendant BTL enforces punitive measures, including doubling the cost of consumables, refusing to

1  continue to supply consumables, and/or removing the provider from its online
2  directory, which is marketed as essential for lead generation and patient visibility.

3      57.    BTL also misleads purchasers into believing they can exit the MAP
4  scheme without jeopardizing their financial investment.

5      58.    Furthermore, the resale market for BTL devices is also highly regulated
6  by BTL, further limiting Plaintiffs' ability to compete and maintain their businesses.
7  For example, any attempt to resell a BTL device triggers an undisclosed
8  "recertification" or "transfer" fee—often in the tens of thousands of dollars. While
9  this fee is vaguely referenced in the purchase agreement, its actual amount is omitted,
10  constituting a material omission and an unfair restraint on exit rights.

11     59.    To further bind purchasers to its MAP pricing system, BTL maintains a
12  continuing security interest in the devices, ensuring compliance with post-sale
13  obligations and making resale or transfer of the devices exceedingly difficult. This
14  mechanism effectively prevents buyers from recouping their investment, even when
15  the devices fail to generate the promised return and undermines BTL's
16  representations that it promotes a fair and open marketplace.

17     60.    Defendant BTL worked hand-in-hand with private equipment financing
18  companies to arrange for equipment financing agreements for its customers,
19  including Plaintiffs, which were arranged with BTL-preferred equipment financing
20  companies, including Defendants MMP, DEXT, NORTH MILL, TIMEPAYMENT
21  and AMUR, without any input from the purchasers or disclosures to them, which
22  included the payment of kickbacks to Defendant BTL by the financing companies.

23     61.    At all times relevant to this Complaint, Defendant BTL has utilized
24  Defendant MMP as its preferred financing partner for the purchase of BTL devices,
25  with the vast majority of purchasers of BTL devices executing equipment financing
26  agreements with MMP at the direction of Defendant BTL.

27     62.    However, unbeknownst to Plaintiffs and the members of the putative
28  class, Defendant MMP was acting primarily as a broker for other equipment finance

companies, and rather than retain its rights under the equipment financing agreements, Defendant MMP would frequently assign its rights under the equipment financing agreements to Defendants DEXT, AMUR, NORTH MILL, and TIMEPAYMENT, often doing so within a matter of days after the agreements were executed, ***and without notice to the purchasers***.

63.    Defendant MMP executed "broker agreements" with Defendants DEXT, AMUR, NORTH MILL and TIMEPAYMENT under which Defendant MMP would receive a broker fee for assigning the equipment financing agreements to the other Defendants. Examples of these broker agreements executed with Defendants DEXT and AMUR are attached hereto as Exhibits A and B.

64.    Upon information and belief, Mr. John-Paul Smolenski, the founder, president, and chief executive officer of Defendant MMP, frequently attended the sales conferences put on by BTL. Upon agreeing to purchase a BTL device, purchasers were frequently ushered to Mr. Smolenski who was prepared to execute an Equipment Financing Agreement, without performing any due diligence to ensure the purchasers were sufficiently credit-worthy.

65.    All of Plaintiffs' financing documents were completed and submitted by BTL employees on Plaintiffs' behalf. Unbeknownst to Plaintiffs, the MMP Equipment Financing Agreement BTL used, which was single spaced and printed in very fine print, included the following personal guarantee:

> "In consideration of Creditor entering into the EFA, the undersigned, together and separately, unconditionally, personally and irrevocably guarantee to Creditor the prompt payment and performance of all Debtor's obligations now and/or hereafter owes to Creditor. You agree that this is a guaranty of payment, not collection, and that Creditor can proceed directly against you without first proceeding against Debtor or the Collateral. You waive notice of acceptance, acceleration and default and all defenses, including protest, presentment and demand. Creditor may renew, extend or otherwise change the terms of the EFA without notice to you and you will be bound by

1
2
3
4
5

such changes, and you will pay all of Creditor's costs of enforcement and collection, including reasonable attorneys' fees. This Guaranty is binding on your heirs, administrators, representatives, successors and assigns and survives the insolvency, bankruptcy or discharge from bankruptcy of Debtor."

6    66.    This personal guarantee was not disclosed or explained to Plaintiffs.

7 Each of the equipment financing agreements used by Defendants DEXT, NORTH

8 MILL, TIMEPAYMENT and AMUR contain substantially similar language.

9    67.    Defendant MMP also engaged in the practice of financing "split"

10 transactions, which were used to induce third-party equipment financing companies

11 to approve customer financing that the customer could not afford by splitting one

12 transaction into two smaller transactions and simultaneously assigning them to two

13 different equipment financing companies.

14    68.    For example, on September 20, 2022, Plaintiff Jennifer Tabiza

15 Optometrist, APC signed two equipment financing agreements with MMP, for the

16 Emface device and the Emsculpt Neo device, both of which carried an approximately

17 $200,000 equipment price, not including financing charges. However, according to

18 the UCC-1 forms filed with the California Secretary of State, MMP assigned the

19 Emface contract to DEXT on September 26, 2022 and assigned the Emsculpt Neo

20 contract to North Mill Credit Trust on September 29, 2022. Upon information and

21 belief, this "split" transaction was facilitated by MMP because neither DEXT nor

22 NORTH MILL would have approved Tabiza for the combined transaction, nor would

23 they have approved Tabiza for either individual transaction had they known of the

24 other transaction. But by assigning them to two different equipment financing

25 companies within a short period of time, the "split" transaction was undetectable by

26 DEXT and NORTH MILL at the time that they accepted the assignments. The

27 existence of this practice by MMP underlines the fact that MMP knew that BTL and

28

MMP were inducing Plaintiffs and other similarly situated individuals and businesses to enter into financing arrangements that were likely to result in default.

69.    In some instances, the second device is represented to the purchaser as a "free gift" when in reality MMP needed it in order to facilitate a prohibited "split" financing transaction.

70.    Defendant MMP has actually admitted to facilitating these prohibited "split" transactions during a dispute with Defendant AMUR. Specifically, Defendant MMP's founder, President and CEO, John-Paul Smolenski, admitted in e-mails to Todd Wainwright, the Senior Vice President and Head of Commerce & Strategic Partnerships for Defendant AMUR, that at least 28 different transactions constituted prohibited "split" transactions that violated the broker agreement between Defendant MMP and Defendant Amur, and were therefore subject to being repurchased by Defendant MMP. These transactions are currently the subject of a summary judgment motion filed by Defendant AMUR in a lawsuit currently pending in Nebraska state court, in Lancaster County, Amur Equipment Finance, Inc. v. MMP Capital Inc., Case No. CI 25-220. A copy of the e-mail correspondence submitted in the summary judgment motion in the aforementioned matter is attached hereto as Exhibit C.

71.    While Defendant AMUR maintains that it was unaware that it was purchasing "split" transactions from Defendant MMP, Defendant MMP counters that Defendant AMUR was well aware of Defendant MMP's practice of facilitating "split" transactions because in March of 2019, in connection with a contemplated acquisition of Defendant MMP by Defendant AMUR, Todd Wainwright and Defendant AMUR were given access to Defendant MMP's portfolio of equipment financing agreements to conduct due diligence, and that the portfolio included records that plainly revealed Defendant MMP's common practice of facilitating "split" transactions. Defendant MMP further alleges that there was a subsequent meeting between Smolenski and representatives of Defendant AMUR on April 10, 2019 to discuss the contemplated acquisition, during which Smolenski described Defendant

MMP's business model to Wainwright and other representatives of Defendant AMUR, including Defendant MMP's frequent use of "split" transactions. *See* Defendant MMP Capital Inc.'s Brief In Support of Special Appearance and Motion to Dismiss, filed on April 8, 2025 in Lancaster County, Nebraska, Case No. CI 25-220.

72.    The financing arrangements are made without full disclosure to the purchasers of the risks and without adequately explaining that Defendant BTL's promised marketing support is either non-existent or ineffective. Instead, purchasers are left with significant debt obligations and minimal means to generate revenue to cover their costs. Defendant BTL's failure to disclose these material facts constitutes fraudulent concealment and deception.

73.    Additionally, Defendants have aggressively enforced the equipment financing agreements against Plaintiffs and other similarly situated individuals and businesses, including Defendants DEXT and AMUR suing Plaintiff Nicole King for the full value of the equipment financing agreements, without any offsets, despite the fact that Plaintiff Nicole King voluntarily returned her BTL devices months ago.

## CLASS ACTION ALLEGATIONS

74.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of themselves and all other similarly situated individuals, defined as follows:

> **Nationwide Class:** All persons and entities in the United States who entered into sales agreements with BTL Industries, Inc. for the purchase of one or more aesthetic medical devices, including components of said devices, and obtained financing through one of BTL's lenders, from the period of four years prior to the filing of this action to the present (the "Class Period").

75.    In the alternative, Plaintiffs bring this action individually and on behalf of the following proposed State Classes of similarly situated persons defined as follows:

**California Class:** All persons and entities in California who entered into sales agreements with BTL Industries, Inc. for the purchase of one or more aesthetic medical devices, including components of said devices, and obtained financing through one of BTL's lenders, from the period of four years prior to the filing of this action to the present.[2]

76.    Excluded from the Class are Defendants, as well as their officers, directors, or employees; officers, directors, or employees of any entity in which Defendants currently have or has had a controlling interest; and Defendants' legal representatives, heirs, successors, and assigns.

77.    Plaintiffs reserve the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based upon, among other things, changing circumstances and/or new facts obtained during discovery.

78.    The Class members are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Class contains hundreds of individuals and/or businesses who have been damaged by Defendants' conduct as alleged herein. The precise number of Class members is unknown to Plaintiffs at this time.

79.    Each member of the proposed Class herein has been exposed to and relied upon Defendant BTL's false and/or misleading sales and marketing tactics. The sales of each device by Defendant BTL to Class Members throughout the Class Period has resulted from Defendant BTL's sales representatives and marketing materials falsely promising that purchases of Defendant BTL's devices would include sales leads and marketing support to increase treatment sales. Defendant BTL's deceptive practices also included imposing price-fixing requirements, which prevented Class Members from competitively selling treatments to generate revenue to pay off high interest financing agreements entered into based on Defendant BTL's

---

[2] The Nationwide Class and the California Class are collectively referred to as the "Class".

misrepresentations. Each Class Member was deceived and induced into entering equipment financing agreements with the financer for their purchase transaction, including Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR with no disclosure to them of the financers' relationship to BTL and no knowledge that the financing approval was made possible through Defendants' fraud.

80.    Common questions of law and/or fact exist in this case with respect to the proposed Class, which predominate over any questions affecting individual members of the Class. The common questions of law and/or fact include, but are not limited to, the following:

(a)    Whether, during the Class Period, Defendant BTL used false representations and/or falsely advertised marketing and sales generation support to induce Class Members into purchasing equipment;

(b)    Whether the Class Members' contracts are vitiated by Defendants' fraudulent conduct;

(c)    Whether Defendants intentionally misrepresented and/or omitted material facts to Class Members to induce Class Members to purchase one or more device(s);

(d)    Whether the Class Members relied on these misrepresentations and omissions;

(e)    Whether Defendants negligently provided false information to the Class Members;

(f)    Whether Class Members have suffered financial losses due to Defendants' misrepresentation;

(g)    Whether, during the Class Period, Defendant BTL engaged in monopolistic practices by controlling the market for medical and aesthetic equipment;

(h)    Whether Defendant BTL's actions violate California's antitrust laws, including without limitation the Cartwright Act;

(i)    Whether Defendants assumed a fiduciary duty by controlling the financing process for Class Members;

(j)    Whether Defendants breached their fiduciary duties by prioritizing their interests over those of the Class Members;

(k)    Whether Defendants breached the terms of the equipment/device(s) sales contracts with the Class Members;

(l)    Whether a failure of consideration entitles Class Members to rescind the contracts;

(m)    Whether Defendant BTL's use of the misleading, false and deceptive sales and marketing scheme described herein constituted false advertising under California law;

(n)    Whether Defendants engaged in unfair, unlawful, and/or fraudulent business practices under California law;

(o)    Whether Plaintiffs and Class members are entitled to damages and/or restitution and the proper measure of such losses;

(p)    Whether Defendant BTL continues to use false, misleading, and/or illegal price fixing such that an injunction is necessary.

(q)    Whether Plaintiffs and Class members will suffer irreparable harm should they be required to continue making payments under the terms of the equipment financing agreements.

81.    Plaintiffs' claims are typical of the claims of the Class Members because Plaintiffs, like all Class Members, were deceived by Defendants' false and deceptive sales trajectories, promised marketing and sales support and post-purchase price fixing, and were subject to Defendants' equipment financing agreements, as alleged herein, in a typical consumer setting and sustained damages from Defendants' wrongful conduct.

82.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in litigating complex class actions. Plaintiffs have no interests that conflict with those of the Class.

83.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

84.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met, as Defendants have acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

85.    Defendants' conduct is generally applicable to the Class as a whole and Plaintiffs seek, *inter alia*, equitable remedies with respect to the Class as a whole. As such, Defendants' systematic practices make declaratory relief with respect to the Class as a whole appropriate.

86.    The requirements of Fed. R. Civ. P. 23(b)(3) are met as common issues predominate over any individual issues, and treatment of this matter as a class action is superior to numerous individual actions.

87.    The litigation of separate actions by Class Members would create a substantial risk of inconsistent of varying verdicts or adjudications with respect to the individual Class Members against Defendants herein; and which would establish potentially incompatible standards of conduct for Defendants; and/or legal determinations with respect to individual Class Members which would, as a practical matter, be dispositive of the interests of the other Class Members not parties to adjudications or which would substantially impair or impede the ability of the Class Members to protect their interests.

/ / /

/ / /

/ / /

**FIRST CAUSE OF ACTION**

**Breach of Fiduciary Duty**

*(Against All Defendants)*

88.    BTL voluntarily sent Plaintiffs' applications to specific lenders, MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR thus taking control of the purchase financing and inducing Plaintiffs to enter into onerous and unconscionable contractual terms.  This voluntary act placed BTL and the financing Defendants, in a fiduciary relationship with Plaintiffs, acting as the more qualified and experienced contracting entities, advising Plaintiffs on financing, submitting their applications to hand-picked lenders BTL chose, with high interest rates and strict terms, all the while Plaintiffs believed that BTL and the financing Defendants were helping them through the process.

89.    As fiduciaries, Defendants were legally bound to put the buyer's best interests ahead of their own by knowingly accepting a duty on behalf of another. Defendants were required, as fiduciaries, to act as prudent persons in the buyer's best interest but did not.

90.    Acting for both the buyer and the seller, BTL and the financing Defendants created a conflict of interest, arranging loans for the buyer, using expertise in conducting loan closings, benefiting BTL with significant sales that it knew or should have known would ultimately harm a buyer, thereby breaching the fiduciary duty to Plaintiffs and the putative Class Members, causing them damage.

91.    The loan contracts at issue were contracts of adhesion, drafted in favor of the lenders and seller, with a company that had a monopoly on the products, and contained non-negotiable terms. For example, one such Equipment Financing Agreement contains a clause stating:

> Creditor may renew, extend or otherwise change the terms of the EFA
> without notice to you and you will be bound by such changes, and you
> will pay all of Creditor's costs of enforcement and collection, including
> [reasonable] attorneys' fees. This Guaranty is binding on your heirs,

administrators, representatives, successors and/or assigns and survives
the insolvency, bankruptcy or discharge from bankruptcy of the Debtor.

92.    Additional provisions within the contract, undisclosed to Plaintiffs,
included a requirement that the buyer MUST charge BTL's suggested retail price for
services/treatments on the purchased equipment or the equipment warranty would be
terminated. Thus, BTL engaged in price fixing, controlling the price the buyer could
charge for services in using the equipment.

93.    Due to the above, Defendants, their employees, agents, and assigns,
breached their fiduciary duties owed to Plaintiffs.

## SECOND CAUSE OF ACTION

### Fraud and Fraudulent Deceit

*(Against Defendants BTL and MMP)*

94.    Plaintiffs repeat and reallege each of the foregoing allegations, as though
fully set forth herein.

95.    Under Cal. Civ. Code § 1567, fraud is a ground for defeating claims of
contractual consent, including instances where a party is induced to enter into
agreements under false pretenses. As established in *Rattagan v. Uber Technologies*,
Inc., 17 Cal.5th 1 (2024), fraud vitiates any consent that might have been obtained
when deceptive practices influence a party's decision to enter a contractual
agreement.

96.    Cal. Civ. Code § 1572 defines "actual fraud" as including "the
suppression of that which is true, by one having knowledge or belief of the fact."
Defendants' conduct involved the intentional suppression of material facts and the
making of false representations intended to mislead Plaintiffs and Class Members.

97.    Additionally, Cal. Civ. Code § 1709 provides that "fraudulent deceit" is
actionable as a tort, while § 1710 defines deceit to include "the suppression of a fact,
by one who is bound to disclose it, or who gives information of other facts which are

likely to mislead for want of communication of that fact." Defendants' actions constituted fraudulent deceit within the meaning of these provisions.

98.    BTL and MMP, including their employees, agents, and assigns, engaged in fraudulent conduct by:

- Misrepresenting or omitting essential details of the financing arrangements offered to Plaintiffs and Class Members;

- Misleading Plaintiffs about the beneficial effects the purchase of Defendant's devices would have on their businesses, including unrealistic revenue projections;

- Assuming control over the financing process without adequately informing Plaintiffs of their right to seek alternate financing options;

- Fraudulently altering financial documents in order to obtain approval for high loan amounts, including falsifying credit reports;

- Issuing loans based on non-existent and/or falsified valuations of loan collateral;

- Concealing advertising rebates as illusory collateral to secure loans;

- Concealing loan collateral from Plaintiffs and Class Members to achieve financing approval;

- Failing to advise Plaintiffs of their right to pursue alternate financing, thereby coercing them into Defendants' preferred financing agreements;

- Making ancillary agreements and promises as incentives to purchase devices, which were subsequently not honored;

- Facilitating "split" transactions in order to qualify purchasers for excessive amounts of debt obligations;

- Artificially inflating the amount to be financed in order to pay kickbacks to BTL sales representatives in exchange for funneling purchasers to MMP;

- Automatically filing applications for financing with MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR limiting Plaintiffs' ability to independently choose suitable financing options.

99.    Defendants' fraudulent conduct was undertaken with the intent to obtain an unjust advantage by inducing Plaintiffs and Class Members to purchase devices and enter into high-interest financing agreements under false pretenses.

100.    Plaintiffs and Class Members justifiably relied on Defendants BTL and MMP's misrepresentations and omissions in deciding to purchase the devices and enter into financing agreements. Had Plaintiffs and Class Members been informed of the true nature of the financing arrangements and the realistic potential for revenue generation from purchasing the devices, they would not have entered into the agreements.

101.    As a result of Defendants BTL and MMP's fraudulent conduct, Plaintiffs and the Class Members have suffered substantial financial harm, both paying out of pocket on high interest loans, experiencing unrealized business opportunities, entering bankruptcy, and will continue to suffer harm. By the same token, as a result of these same practices, Defendants have unfairly reaped substantial gains in sky-rocketing device sales continued growth in market they monopolize.

## THIRD CAUSE OF ACTION

### Fraudulent Concealment or Omission

*(Against All Defendants)*

102.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

103.    Defendants, acting through their sales representatives, agents, loan officers, and marketing channels, knowingly and willfully concealed or omitted material facts regarding the actual revenue potential of BTL's devices and the availability of promised marketing and advertising support.

104.   Rather than disclose the truth about the devices' profitability and lack of promised support, Defendants actively promoted the devices with false representations to induce Plaintiffs and the Class to purchase the devices and enter into high-interest financing agreements.

105.   Defendants' concealment and omissions were material because they directly impacted Plaintiffs' and the Class Members' decisions to purchase the devices and commit to financing agreements based on false promises.

106.   Defendants knew or should have known that their representations about the products were false in that BTL artificially inflated projected sales revenues and competitive pricing is restricted when prices are fixed and not competitive as described throughout.   Defendant BTL knowingly allowed its sales reps, and marketing materials to intentionally mislead customers, such as Plaintiffs, by promising post-purchase support and sales leads, promotional materials, and that Plaintiffs would be the only purchasers within their geographic vicinity, with no intent to follow through. Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR knew or should have known that BTL was supplying them with falsified or otherwise grossly inaccurate data and financial documents in order to secure loans for Plaintiffs and the Class Members. Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR also knew or should have known that the terms of these loans were materially misrepresented to Plaintiffs at the time they were signed.

107.   Plaintiffs and the Class reasonably relied on Defendants' partial representations and omissions, believing that the devices would generate sufficient revenue through marketing support and advertising leads as promised by Defendant so as to render the purchases sound business decisions.

108.   As a direct and proximate result of Defendants' fraudulent concealment and omissions, Plaintiffs and the putative Class have suffered substantial damages,

including financial losses due to their inability to generate revenue sufficient to satisfy the high-interest financing agreements.

109.   Defendants' conduct was malicious, oppressive, and carried out with willful and reckless disregard for the rights and financial well-being of Plaintiffs and the Class.

110.   Plaintiffs and the Class are entitled to compensatory damages, punitive damages, attorneys' fees, costs, and all other relief the Court deems proper.

**FOURTH CAUSE OF ACTION**

**Violation of California's Antitrust Law**

**California Business & Professions Code §§ 16700 – 16770**

*(Against Defendant BTL)*

111.   Plaintiffs repeat and reallege each of the foregoing allegations, as though fully set forth herein.

112.   The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 - 16770, prohibits agreements, combinations, or conspiracies to restrain trade or engage in unfair methods of competition.

113.   BTL has engaged in unlawful restraints of trade through its conduct, including, but not limited to:

- BTL possesses monopoly power as the sole patentee and exclusive distributor in a clearly defined economic and geographic market and proved its intent to maintain that power with lawsuits against companies attempting to sell like equipment in the United States.

- BTL manipulated financial contracts and resources of customers unrelated to the patent, in order to obtain an advantage that was not just being the sole vendor of the product.

- BTL asserted significant pressure on purchasers during sales pitches, ran credit reports without consent, and obtained loan approval all within a

single sales pitch, thereby asserting undue influence over the terms of the agreement and inducing Class Members to assent to the one-sided terms.

- BTL controls the product prices and/or excludes competition in the United States market. By requiring purchasers of its devices to adhere to minimum pricing agreements, BTL thereby prevents Class Members from selling treatments at competitive prices.

- BTL utilized deceptive advertising practices to induce Class Members to enter high-interest financing agreements, while simultaneously imposing price-fixing requirements that restricted their ability to profit from the use of Defendant BTL's devices.

- Engaging in coercive marketing practices designed to prevent fair competition in the marketplace for aesthetic medical devices.

- BTL used its power as sole producer of the Emsculpt line of devices to threaten Plaintiffs and Class Members with being cut-off from future purchases of consumable products necessary to the function of the devices, such as auxiliary "paddles" and applicators used to administer treatments.

- Defendant BTL's conduct constitutes a conspiracy or agreement that unreasonably restrains trade and undermines free competition in violation of the Cartwright Act.

114. Plaintiffs detrimentally relied upon BTL, its employees, agents, and assigns, and its selected lenders when BTL induced them to purchase equipment that it knew Plaintiffs would be unable to pay for, and the chosen lenders provided the loans. Plaintiffs paid duplicative fees and charges to multiple lenders and signed contracts of adhesion, causing irreparable damage to Plaintiffs.

115. BTL claimed Plaintiffs would obtain thousands of dollars in sales, completed their loan applications, which made them privy to their lack of financial ability to obtain loans in the amounts necessary to purchase BTL products and

therefore knew they could not repay the loans. Plaintiffs were induced to sign financial contracts that BTL knew were beyond Plaintiffs' legal understanding ability to pay, which caused Plaintiffs substantial harm and damages. Specifically, all Plaintiffs have been subject to monthly payments toward the devices in the range of three to ten thousand dollars, inability to sell treatments at a profit because of BTL's artificial price fixing that is out of sync with the market, and emotional and financial distress due to notices sent by Defendants threatening legal action for selling treatments below MAP pricing and failing to fully pay loan obligations.

116.   As a result of Defendant BTL's fraudulent conduct, Plaintiffs and the Class Members have suffered substantial financial harm, both paying out of pocket on high interest loans and experiencing unrealized business opportunities and will continue to suffer harm.

**FIFTH CAUSE OF ACTION**

**Fraudulent/Intentional Misrepresentation**

*(Against Defendant BTL)*

117.   Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

118.   Plaintiffs bring this claim individually and on behalf of the Class under California law.

119.   Defendant BTL falsely represented to Plaintiffs and the Class that they would receive a dramatic increase in revenue and promised sales and advertising support by purchasing its products to use to conduct treatments on their clients.

120.   Defendants intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs and the Class to purchase the Products.

121.   Plaintiffs did in fact rely on these misrepresentations and purchased the products to their detriment. Given the deceptive manner in which Defendants advertised, marketed, represented and otherwise promoted the Products, Plaintiffs' and the Class's reliance on Defendants misrepresentations was justifiable.

1    122.   As a direct and proximate result of Defendants' conduct, Plaintiffs and

2    the Class have suffered actual damages in that they have purchased products by

3    entering high interest financing agreements in the hundreds of thousands of dollars

4    and are unable to use the products due to enforced non-competitive pricing.

5    123.   Plaintiffs and the Class seek actual damages, attorney's fees, costs, and

6    other such relief the Court deems proper.

7    ### SIXTH CAUSE OF ACTION

8    ### Negligent Misrepresentation

9    *(Against Defendant BTL)*

10    124.   Plaintiffs repeat and re-allege the allegations contained in every

11    preceding paragraph as if fully set forth herein.

12    125.   Defendant BTL owed duties to Plaintiffs and the Class to exercise

13    reasonable care in, marketing, advertising, selling, providing information regarding

14    the devices, including revenue potential, marketing support, profitability of the

15    devices, and procuring loans that Plaintiffs and the Class were financially qualified

16    to receive.

17    126.   Defendant BTL breached its duties to Plaintiffs and the Class by

18    negligently providing false and misleading information including misrepresentations

19    about the revenue potential of Defendant BTL's products; false promises of

20    marketing support, advertising materials, and sales referrals that were never

21    provided; and inducing the Plaintiffs and the Class to enter high-interest agreements

22    under misleading pretenses.

23    127.   Defendant BTL knew or should have known that the representations

24    made were false, inaccurate, or misleading, and that Plaintiffs and the Class would

25    reasonably rely on such representations when purchasing the products and signing

26    finance agreements.

27    128.   As a direct and proximate result of Defendant BTL's negligent

28    misrepresentations, Plaintiffs and the Class have suffered actual damages including

financial losses resulting from their inability to generate revenue sufficient to satisfy the high-interest finance agreements.

129.    Plaintiffs and the Class seek actual damages, attorney's fees, costs, and any other such relief the Court deems proper.

## SEVENTH CAUSE OF ACTION

### Breach of Contract and Failure of Consideration

*(Against All Defendants)*

130.    Based upon the foregoing facts, Defendants breached the equipment sale contracts and equipment loan contracts and as a result there was failure of consideration entitling Plaintiffs to have the contracts rescinded.

131.    The equipment financing agreements entered into between Plaintiffs and Defendants contain terms rendering the contracts illusory and thus lacking consideration. For example, one such agreement contains the provision: "Creditor may renew, extend or otherwise change the terms of the EFA without notice to you and you will be bound by such changes, and you will pay all of Creditor's costs of enforcement and collection, including [reasonable] attorneys' fees." Because only one party is bound by the terms of the contract, and those terms may be altered unilaterally by the other party, there is insufficient consideration to render the Equipment Financing Agreements enforceable.

## EIGHTH CAUSE OF ACTION

### Violation of California's Unfair Competition Law ("UCL")

### California Business and Professions Code § 17200, *et seq.*

*(Against All Defendants)*

132.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

133.    Defendants' conduct described herein violates each of the three prongs of the Unfair Competition Law (the "UCL"), codified at California Business

and Professions Code § 17200, *et seq.*, as it constitutes unlawful, unfair, and fraudulent conduct under each of the statute's three independent liability theories.

134.  The UCL prohibits, and provides civil remedies for, "unfair competition". Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

135.  By defining unfair competition to include "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable and sweeps within its scope acts and practices not specifically proscribed by any other law.

136.  The UCL imposes strict liability. Plaintiffs need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

*"Unfair Prong"*

137.  A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

138.  Defendants committed unfair business practices in violation of the UCL in the following respects, among others:

- Defendant BTL engaged in misleading and deceptive sales tactics that represented unrealistic revenue potential and failed to deliver the promised post-purchase support including advertising and sales referrals.

- Defendant BTL's sales representatives promoted the purchase of BTL's devices by suggesting that such purchases would lead to a

1  dramatic increase in revenue streams. These unrealistic projections
2  resulted in Plaintiffs swiftly amassing large amounts of debt and
3  entering financing agreements that were impossible to break.

4  • Defendant BTL imposed price fixing requirements on Plaintiffs,
5  preventing them from offering treatments at competitive prices.
6  Defendants' practices were immoral, unethical, oppressive, and
7  substantially injurious to consumers.

8  • Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and
9  AMUR knew or should have known that BTL was supplying Plaintiffs
10  with falsified or otherwise grossly inaccurate data and financial
11  documents in order to secure loans for Plaintiffs and the Class
12  Members.

13  • Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and
14  AMUR also knew or should have known that the terms of these loans
15  were materially misrepresented to Plaintiffs at the time they were
16  signed

17  139. The harm to Plaintiffs and Class Members outweighs the utility of
18  Defendants' practices. There were reasonably available alternatives to further
19  Defendants' legitimate business interests other than the misleading and deceptive
20  conduct described herein.

21  *"Fraudulent" Prong*

22  140. A business act or practice is "fraudulent" under the UCL if it is
23  likely to deceive members of the consuming public.

24  141. Defendants' acts and practices alleged above constitute fraudulent
25  business acts or practices as they have deceived Plaintiffs and are highly likely to
26  deceive members of the consuming public. Plaintiffs relied on Defendants'
27  fraudulent and deceptive representations through the sales representatives, website,
28  sales conferences, verbal commitments, and presentation of loan documents.

142.   Such representations included unrealistic earnings potential based upon inflated or completely false sales data, unfulfilled promises of sales generation, promised advertising and marketing support for products which Defendant BTL sells which were never provided, and enforcement of loan terms known to be unlawful under California law. These misrepresentations played a substantial role in Plaintiffs' decision to purchase those products often resulting in the purchase of multiple devices at once.

143.   Plaintiffs would not have purchased those products without Defendants' misrepresentations.

**"Unlawful" Prong**

144.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

145.   Defendants' deceptive business practices violated numerous other laws, such as statutory laws, Cal. Bus. & Prof. Code § 17500 and common law principles related to fraud, contract law, and unfair competition, as set forth herein.

146.   As a result of BTL's violations of the FAL, and other laws, Plaintiffs and the Class Members have each lost substantial sums of revenue and are paying out of pocket on high interest loans and will continue to suffer harm. By the same token, as a result of these same practices, BTL has unfairly reaped substantial gains in sky-rocketing device sales and continued growth in the market they monopolize fueled by unlawful misrepresentations.

147.   As a result of Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR's various violations of California law, as alleged in all previous paragraphs, Plaintiffs and the Class Members have each been subject to unlawful and high-interest loan agreements, lost substantial sums of revenue and will continue to suffer harm. By the same token, as a result of these same practices, Defendants MMP, DEXT, TIMEPAYMENT, NORTH MILL, and AMUR have unfairly reaped

substantial gains through servicing loans knowingly obtained through unlawful means.

148.   Defendants' practices, as set forth above, have misled Plaintiffs, and the proposed Class, in the past and will continue to mislead in the future. Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

149.   Pursuant to the UCL, Plaintiffs and the Class are entitled to disgorgement and restitution of all of Defendants' revenues associated with their unfair competition, or such portion of those revenues as the Court may find equitable.

150.   Because Defendants continue to deceive current and prospective customers, public injunctive relief under the UCL is also necessary.

## NINTH CAUSE OF ACTION

### Violation of California's False Advertising Law ("FAL")

### California Business & Professions Code § 17500, *et seq.*

*(Against Defendant BTL)*

151.   Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

152.   Defendant BTL's conduct described herein violates California's False Advertising Law (the "FAL"), codified at California Business and Professions Code section 17200, et seq.

153.   The FAL provides in pertinent part, that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof . . . to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet,

any statement, concerning . . . those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell . . . those services, professional or otherwise, so advertised at the price stated therein, or as so advertised…"

154.   Like the UCL, the FAL expressly provides for injunctive relief, and also contains provisions denoting its public purpose. A claim for injunctive relief under the FAL is brought by Plaintiffs acting in the capacity of a private attorney general. Although the private litigant controls the litigation of an FAL claim, the private litigant is not entitled to recover compensatory damages for his own benefit, but only disgorgement of profits made by the Defendants through untrue or misleading advertising in violation of the statutory scheme or restitution to victims of the untrue or misleading advertising.

155.   Defendants engaged in untrue and/or misleading advertising practices in violation of the FAL in the following respects, among others:

- Defendant BTL engaged in misleading and deceptive sales tactics that represented unrealistic revenue potential and failed to deliver the promised post-purchase support including advertising and sales referrals.

- Defendant BTL's sales representatives promoted the purchase of BTL's devices by suggesting that such purchases would lead to a "dramatic increase in revenue streams". These unrealistic projections resulted in Plaintiffs swiftly amassing large amounts of debt and entering financing agreements that were impossible to break.

- Defendant BTL imposed price fixing requirements on Plaintiffs, preventing them from offering treatments at a competitive price. Defendants practices were immoral, unethical, oppressive, and substantially injurious to consumers.

156. BTL disseminated these misleading statements through various channels, including sales representatives, promotional materials, sales conferences, and marketing campaigns.

157. The harm to Plaintiffs and the Class Members arising from BTL's untrue and/or misleading advertising practices relating to the earning potential and BTL's advertising, sales, and marketing support to be included in the purchase of its devices outweighs the utility, if any, of those practices.

158. Plaintiffs and Class Members relied on BTL's misrepresentations when deciding to purchase BTL's devices over its competitors and how many devices to purchase, entering into high-interest financing agreements for hundreds of thousands of dollars. No rational person would assume this level of debt at high interest rates absent BTL's wrongful conduct.

159. BTL's untrue and/or misleading advertising practices relating to the earning potential and BTL's advertising, sales, and marketing support to be included in the purchase of its devices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/ or substantially injurious to Plaintiffs and the Class Members.

160. As a result of Defendants' violations of the FAL, Plaintiffs and the Class Members have each lost substantial sums of revenue and are paying out of pocket on high interest loans and will continue to suffer harm. By the same token, as a result of these same practices, Defendant BTL has unfairly reaped substantial gains with sky-rocketing BTL device sales and substantial growth in the market they monopolize.

161. Because Defendant BTL continues to deceive current and prospective customers, public injunctive relief under the FAL is also necessary.

## **TENTH CAUSE OF ACTION**

### **Monopoly in Violation of California Law**

*(Against Defendant BTL)*

162.    Plaintiffs repeat and reallege each of the foregoing allegations, as though fully set forth herein.

163.    BTL has willfully acquired and maintained monopoly power in the market for non-invasive body-contouring and aesthetic medical devices in violation of California's Cartwright Act (Bus. & Prof. Code §§ 16700–16770), as well as California common law.

164.    BTL holds the sole patent rights to its Emface and Emsculpt series devices and uses this market dominance to eliminate or severely restrict competition by: (a) blocking the importation of competing devices; (b) enforcing RPM and MAP agreements that suppress price competition among providers; and (c) leveraging its sales and financing structures to prevent small business purchasers from seeking alternative vendors.

165.    BTL further entrenches its monopoly by requiring providers to purchase proprietary consumables and enforcing punitive penalties for non-compliance, effectively eliminating aftermarket competition.

166.    BTL's monopoly conduct is not merely based on the patent itself, but on its use of the patent as a lever to extend control over downstream pricing, financing, and resale markets, thereby harming both competition and consumers.

167.    Plaintiffs and Class Members, direct purchasers, and users of BTL's devices, have suffered financial harm because of BTL's monopolistic practices, including inflated prices, foreclosure of alternative products, and anti-competitive contractual constraints.

168.    BTL's conduct constitutes unlawful monopolization under the Cartwright Act and California common law. Plaintiffs and Class Members seek treble

1  damages pursuant to Cal. Bus. & Prof. Code § 16750(a), injunctive relief, attorneys'

2  fees, and any other relief deemed appropriate by the Court.

## ELEVENTH CAUSE OF ACTION

### Recission

### California Civil Code § 1689

*(Against All Defendants)*

7  169.  Plaintiffs repeat and re-allege the allegations contained in every

8  preceding paragraph as if fully set forth herein.

9  170.  BTL, through its sales representatives, made false representations to

10 Plaintiffs and Class Members, including that they would not be competing with any

11 other BTL devices in their geographic vicinity, that other competitors would not be

12 able to undercut them on pricing, and that they could expect revenues from the BTL

13 devices to significantly outpace their cost.

14 171.  These projections were made without basis and were known by BTL to

15 be false.

16 172.  BTL also falsely stated that Plaintiffs and Class Members would receive

17 valuable post-purchase support, and that BTL would actively refer clients to their

18 Medspas.

19 173.  Plaintiffs and Class Members relied on these representations and were

20 induced to sign purchase contracts totaling in the hundreds of thousands of dollars,

21 believing they would receive support and income sufficient to justify the investment.

22 174.  BTL's misrepresentations were intentional, reckless, and made with the

23 purpose of inducing Plaintiffs' and Class Members' reliance. As a direct result,

24 Plaintiffs and Class Members suffered damages including financial distress, unpaid

25 debt, credit harm, and lost business.

26 175.  Plaintiffs and Class Members seek recission of the alleged contracts in

27 addition to compensatory and punitive damages, attorneys' fees, and any further

28 relief deemed proper by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Defendants as follows:

(a)   Certifying this action as a class action, appointing Plaintiffs as the Class representatives, and designating the undersigned as Class Counsel;

(b)   A declaration that Defendants are financially responsible for notifying Class Members of the pendency of this suit;

(c)   A judgment awarding Plaintiffs and all Class Members restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the Class as a result of the unlawful, unfair and/or fraudulent business practices described herein;

(d)   A judgment awarding Plaintiffs and the Class damages under common law and/or by statute, and punitive damages;

(e)   An order enjoining Defendants from continuing to violate the UCL and/or FAL as described herein, and/or an order enjoying Defendants from violating the UCL and/or FAL in the future;

(f)   Rescission of the equipment purchase and financing contracts due to fraud, concealment, or failure of consideration;

(g)   Additional awards for physical, emotional, or economic damage for all senior citizen and disabled Class Members, pursuant to California Civil Code § 1780(b)(1);

(h)   A judgment awarding Plaintiffs and Class Members their costs of suit, including reasonable attorneys' fees pursuant to Code of Civil Procedure § 1021.5 and as otherwise permitted by statute or law, and pre- and post-judgment interest; and

(i)   Granting such other and further relief as this Court may deem just and proper.

1

2   Date: October 14, 2025

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**

By:  */s/ Helen I. Zeldes*
Helen I. Zeldes, Esq. (SBN 220051)
*hzeldes@sshhzlaw.com*
Amy C. Johnsgard, Esq. (SBN 279795)
*ajohnsgard@sshhzlaw.com*
501 West Broadway, Suite 800
San Diego, California 92101
Telephone: (619) 400-4990

Joshua A. Fields (SBN 242938)
*jfields@sshhzlaw.com*
9415 Culver Blvd., #115
Culver City, CA 90232-2616
Tel: (619) 400-4990

**HAINES LAW GROUP, APC**
Paul K. Haines (SBN 248226)
*phaines@haineslawgroup.com*
Fletcher W. Schmidt (SBN 286462)
*fschmidt@haineslawgroup.com*
Ian T. Mallery (SBN 359132)
*imallery@haineslawgroup.com*
2155 Campus Drive, Suite 180
El Segundo, California 90245
Tel: (424) 292-2350
Fax: (424) 292-2355

*Counsel for Plaintiffs and the Proposed Class.*

1

## <u>DEMAND FOR JURY TRIAL</u>

2    Plaintiffs hereby demand a trial by jury for all claims so triable.

3

4                                        Respectfully submitted,

5    Date: October 14, 2025            **SCHONBRUN SEPLOW HARRIS HOFFMAN & ZELDES, LLP**

6

7                              By:  _/s/ Helen I. Zeldes_
                                    Helen I. Zeldes, Esq. (SBN 220051)
8                                   *hzeldes@sshhzlaw.com*
                                    Amy C. Johnsgard, Esq. (SBN 279795)
9                                   *ajohnsgard@sshhzlaw.com*
                                    501 West Broadway, Suite 800
10                                  San Diego, California 92101
                                    Telephone: (619) 400-4990

11                                  Joshua A. Fields (SBN 242938)
                                    *jfields@sshhzlaw.com*
12                                  9415 Culver Blvd., #115
                                    Culver City, CA 90232-2616
13                                  Tel: (619) 400-4990

14                                  **HAINES LAW GROUP, APC**
                                    Paul K. Haines (SBN 248226)
15                                  *phaines@haineslawgroup.com*
                                    Fletcher W. Schmidt (SBN 286462)
16                                  *fschmidt@haineslawgroup.com*
                                    Ian T. Mallery (SBN 359132)
17                                  *imallery@haineslawgroup.com*
                                    2155 Campus Drive, Suite 180
18                                  El Segundo, California 90245
                                    Tel: (424) 292-2350
19                                  Fax: (424) 292-2355

20                                  *Counsel for Plaintiffs and the Proposed Class.*

21

22

23

24

25

26

27

28

# EXHIBIT A

EXHIBIT
**1**

## BROKER AGREEMENT

**This Broker Agreement** ("Agreement") is dated as of June 21, 2019 between MMP Capital, Inc., with an address of 19 Engineers Lane, Farmingdale, NY 11735 ("Broker"), and Dext Capital, LLC, with an address of 5285 Meadows Road, Suite 335, Lake Oswego, OR 97035 ("DEXT").

This Agreement shall apply to all transactions ("Transactions") submitted, arranged or referred by Broker to DEXT including loans, equipment finance agreements and other similar transactions (together with all related documents, "Documents") and the vehicles, equipment or property leased or financed in connection with the Transactions ("Equipment"). Nothing herein obligates DEXT to enter into any Transaction and DEXT may reject any or all Transactions presented to it by Broker for any reason whatsoever. With respect to each referral of a Transaction, the Broker and DEXT will execute a Transaction Referral Schedule in the form attached hereto as Exhibit A.

With respect to each Transaction, Broker hereby represents, warrants, covenants and agrees as follows: (1) Broker will conduct itself in the highest ethical standards in all business dealings with DEXT; (2) in all aspects of any Transaction, Broker has conducted its investigation of such Transaction with care and due diligence, and has forwarded all information to DEXT which is known or available to Broker; (3) neither Broker nor its employees will represent themselves to be employees of DEXT and neither will attempt to waive, vary, alter or in any way change or modify the terms and conditions of any transaction, or make commitments for DEXT without the express written consent of DEXT; (4) no aspect of the Transaction involves fraud or misrepresentation by Broker, any lessee, borrower, guarantor or other party to the Transaction (each, an "Obligor"), vendor or other person and the Transaction is bona fide, legal and valid; (5) Broker has not received any prepaid rent, deposit, payment or other advanced amount from any Obligor or from any vendor or other person with respect to the Transaction or the Equipment; (6) to the best of Broker's knowledge, no Obligor is in default under the Documents; (7) to the best of Broker's knowledge, no Obligor has any defense or counterclaim or valid reason to assert that any Document is illegal, invalid or unenforceable in any respect due to any act or omission of the Broker; (8) to the best of Broker's knowledge, all financial and other statements and information, if any, furnished or made by Broker to DEXT are true and correct in all material respects; (9) Broker has full power and authority to execute, deliver and perform its obligations under this Agreement, and this Agreement has been duly authorized by all necessary action of Broker, duly executed on behalf of Broker and constitutes the legal, valid and binding obligation of Broker, enforceable in accordance with its terms; (10) Broker will disclose to DEXT, in writing, promptly upon receiving knowledge thereof any breach or potential breach of this Agreement or falsity of any representation herein or in the Documents; (11) unless disclosed to DEXT in writing, Broker is acting on its sole behalf and is not acting as a "super broker" or "co-broker" or receiving or sharing compensation for handling any Transaction from any third party and the Documents are not being "re-leased" as that term is generally understood in the equipment finance industry, unless such fact is disclosed in writing at the time such Documents are submitted to DEXT; (12) unless disclosed to DEXT by prior written notice, the Documents are not executed in connection with a "split transaction" and DEXT is the only party being requested to provide or providing funding with respect to the Equipment and any other equipment attached to, or used in conjunction with, the Equipment.

Broker hereby agrees to defend, indemnify and hold DEXT (and at DEXT's option its employees, agents, directors, partners, and shareholders) harmless from and against (a) all claims, demands, suits and legal proceedings ("Actions"); and (b) any and all penalties, losses, liabilities damages, costs, attorneys' fees, court costs and any and all other expenses arising out of or resulting from any misrepresentation, breach or default by Broker hereunder or otherwise relating to a Transaction. Upon the occurrence of a Broker Default, Broker shall immediately refund all commissions with respect to such affected Transactions back to DEXT. Broker further agrees to purchase each Transaction subject to a Broker Default on demand from DEXT for an amount equal to DEXT's unamortized investment, including expenses and costs of enforcement in addition to refunding all commissions. EXCEPT AS STATED IN THIS PARAGRAPH, BROKER SHALL HAVE NO PERSONAL LIABILITY TO DEXT FOR A DEFAULT BY ANY OBLIGOR. Fees paid to Broker for each Transaction shall be agreed by Broker and DEXT in writing prior to execution of any Documents as outlined in the Transaction Referral Schedule. As used in this paragraph, "Broker Default" means any representation or warranty by Broker herein or otherwise made to DEXT is breached, untrue or false in any material respect.

Unless otherwise expressly permitted hereby, all communications and notices provided for herein shall be in writing, and any such notice shall become effective when received (and notices given by mail shall be deemed received five (5) days after being deposited in the mail). Any written notice shall be by personal delivery thereof, including, without limitation, by overnight mail and courier service, United States mail, certified, postage prepaid, return receipt requested or facsimile transmission, in each case addressed to the address listed by the recipient's name, above, or as such recipient shall otherwise specify reasonably in advance.

All representations, warranties, covenants, indemnities and agreements made in this Agreement shall survive consummation of the Transactions contemplated hereby. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns. This Agreement may not be changed, modified, waived, discharged or terminated orally or in any manner other than by an instrument in writing, signed by the party against whom the enforcement of such change, modification, waiver, discharge or termination is sought. Each party shall perform any further acts, execute, and deliver any documents, which may be reasonably necessary to carry out the provisions of this Agreement. In the event that it becomes necessary for

{01071647-2/1/000002}

DEXT to initiate litigation for the purpose of enforcing any rights hereunder or for the purpose of seeking damages for any violation hereof, then, in addition to all other judicial remedies that may be granted, DEXT shall be entitled to recover reasonable attorneys' fees, whether or not suit is actually filed, and all other costs sustained in connection with such litigation. This Agreement has been drafted by counsel for DEXT as a convenience to the parties only and shall not, by reason of such action, be construed against DEXT or any other party. This Agreement and the written documents referred to or described contain the entire agreement of the parties hereto regarding the transactions contemplated hereby and thereby and supersedes all prior negotiations or agreements, written or oral, among such parties regarding such transactions. The invalidity or unenforceability of any part or clause of this Agreement shall not affect the balance of such agreement. This Agreement and the Transactions assigned under this Agreement are assignable by DEXT and shall inure and run to the benefit of DEXT and its successors and assigns.

This Agreement and all documents executed in connection herewith shall in all respects be governed by and construed in accordance with the laws of the state of Oregon, including all matters of construction, validity and performance. Broker acknowledges that this Agreement was entered into in  Clackamas County, Oregon, and that the parties have agreed to the terms hereof with the understanding that any action or proceeding regarding this Agreement or any cause of action whatsoever arising from or related to this Agreement shall be maintained in the state or federal courts in said state and county and Broker hereby submits to jurisdiction and venue, waiving any claim of improper jurisdiction or venue or forum non conveniens, agreeing to accept service at Broker's place of business in any such action. Nothing in this section shall affect the right of any party to serve legal process in any other manner permitted by law or affect the right of any party to bring any action or proceeding in the courts of any other jurisdiction. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING HEREUNDER OR IN ANY WAY CONNECTED WITH THIS AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date first above written.

DEXT: Dext Capital, LLC

BY: _____

Title: _COO_____

Printed Name: _ERIC GROSS____

BROKER: MMP Capital, Inc.

BY: _____

Title: _President_____

Printed Name: _John-Paul Smularski_

**ADDENDUM TO BROKER AGREEMENT DATED JUNE 21, 2019 BETWEEN
EQUIPMENT DEXT CAPITAL ("DEXT") and MMP CAPITAL, INC. ("Broker")  (the
"Agreement")**

This Addendum is attached to and hereby incorporated into the Agreement.  To the
extent that any terms of this Addendum conflict with the provisions of the Agreement,
the terms of this Addendum shall control. Capitalized terms that are used herein without
definition and that are defined in the Agreement shall have the meanings ascribed
thereto in the Agreement.

1.     Broker makes the following agreements, covenants, representations and
warranties to Dext with respect to each Transaction assigned and/or submitted to Dext
on Broker's standard Documents, which covenants, representations and warranties
shall be additional to any other such covenants, representations and warranties made in
the Agreement.

   a. For value received, Broker hereby sells, transfers and assigns to Dext,
      WITHOUT RECOURSE except as stated herein or in the Agreement, all of
      Broker's rights, title and interest  in the Transaction and Documents and the
      Equipment and all other personal property, identified as "Equipment" in the
      Documents, the rent and/or payments under the Documents, all other amounts
      payable under the Documents or by reason of an default or by reason of damage
      to the Equipment, all rights in any guaranty of or security for the Documents
      which may exist), together with all of Broker's rights and remedies under the
      Documents and any guaranty or endorsement thereof, or with respect to any
      security therefore, including, without limitation, the right to collect all rents and
      payments and other sums payable under the Documents such as late fees,
      casualty value payments, indemnity payments, reimbursements for insurance,
      transportation, installation or deinstallation, taxes and maintenance.   Broker
      hereby appoints Dext as its agent and attorney-in-fact, coupled with an interest
      and with full power of substitution except as limited elsewhere in this document,
      to carry out such actions, and to take any action Dext may deem necessary or
      appropriate to protect and preserve its interest in the Documents, the Equipment
      described therein and the proceeds thereof (the "Assigned Interest").

   b. If the assignment of the Documents is deemed to be a secured transaction,
      Broker hereby grants to Dext a security interest in the Assigned Interest and
      authorizes Dext to file a UCC financing statement as it determines is necessary
      to protect its interest therein.

{01072778-1/4001396/000002}

c. Deliveries. As a condition precedent to any obligation of Dext to advance the Consideration, Broker shall deliver to Dext (i) a deal sheet in the form attached hereto as Exhibit A; (ii) the sole original counterpart of the Document that qualifies as the sole original chattel paper of the Document for purposes of possession under Article 9 of the UCC; (iii) an executed Notice and Acknowledgment of Assignment in the form attached hereto as Exhibit B by the Customer; (iv) the documents listed on the Deal Sheet and such other documents as reasonably requested by Dext.

All financial information and credit reports about Customer in Broker's possession have been provided to Dext, and such information and reports are accurate, and have not been altered or changed. Broker hereby agrees to indemnify Dext for any failure to comply with the Regulations.

The Documents executed in connection therewith are in compliance with all applicable laws and regulations, including without limitation, usury laws and have not been altered or materially modified from the form previously reviewed and approved for use by Dext.

Broker has completed and complied with all filings and recordings necessary to protect Dext Capital's interest in the Documents and the Equipment including, but not limited to, filings required by the Uniform Commercial.

2.  This Addendum may be executed in any number of counterparts, which together shall constitute a singly fully executed Addendum.

**BOTH PARTIES HAVE READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS ADDENDUM AND AGREE TO ITS TERMS.**

Dext Capital, LLC

By: _____

Its: _____COO_____

Date: _____

MMP Capital, Inc.

By: _____

Its: _____President_____

(01072778-1/4001396/000002)

# EXHIBIT B



## BROKER AGREEMENT

THIS BROKER AGREEMENT (this **Agreement**) is entered into as of January 16, 2019, by and between Amur Equipment Finance, Inc., a Nebraska Corporation, located at 308 North Locust Street, Grand Island, NE 68801 (**Amur**, also **we, us** or **our**), and MMP Capital Inc., a New York Corporation located at 1061 N. Broadway Massapequa, NY 11758 (**Broker**, also **you** or **your**). In consideration of the mutual promises and covenants contained herein, Amur and Broker agree as follows:

1. **Broker Approval and Scope**
   Upon entry into this Agreement, Amur shall approve Broker to refer certain proposed equipment lease, equipment financing and/or other financing transactions sought by a customer (each, a **Customer**) for Amur's consideration, subject to the terms and conditions of this Agreement (each, a **Transaction**). This Agreement applies to all Transactions submitted by Broker to Amur until such time as this Agreement is terminated or superseded.

2. **Applications**
   For each Transaction, Broker will submit an application signed by the Customer (each, an **Application**), which shall include financial and credit information of the Customer, its principals and each proposed guarantor of the Transaction (each, a **Guarantor**). The Application shall be on a form either approved or supplied by us and include a valid, duly executed, written authorization from the Customer and all Guarantors to obtain credit and financial information at that time (and in the future for any updates, renewals, extensions, amendment or modification) from banks, financial institutions, trade references, credit reporting agencies and others that possess such information (each, a **Credit Authorization**).

3. **Disclosure of Information**
   At the time each Application is submitted to Amur, Broker shall promptly provide in writing all information known to Broker concerning the Transaction (collectively, **Broker Information**), including information regarding the (i) Customer, all Guarantors and their respective creditworthiness; (ii) equipment which is the subject of the Transaction (the **Equipment**) and any other collateral pledged by Customer and any Guarantor to secure the Transaction (collectively with the Equipment, the **Collateral**); and (iii) the vendor(s) of the Equipment. Broker's obligation to provide the Broker Information shall continue until the sooner to occur of (x) Amur's rejection of the Application in its sole discretion and (y) the complete satisfaction of Customer's and all Guarantors' obligations to us. If, for as long as a Transaction remains active in our portfolio, Broker becomes aware of any information that (i) supplements, modifies or contradicts any information Broker previously provided to Amur regarding Customer, or Guarantor and any Collateral; and/or (ii) otherwise relates to the creditworthiness, integrity of and/or value (as applicable) of the Customer, any Guarantor, any vendor and/or any Collateral, Broker shall immediately advise Amur of such information in writing. If so requested by Amur, Broker shall also obtain from a Customer any information that Amur may request for as long as a Transaction is active in our portfolio.

4. **Approvals**
   Amur may approve or reject any Application in its sole discretion. If Amur approves an Application (an **Approval** or **Approved Transaction**), Amur shall promptly advise Broker of such Approval and Broker shall then promptly advise Customer.

5. **Rejections**
   If an Application is rejected in whole or in part, Amur shall advise Broker and Broker shall advise Customer and all Guarantors of the rejection in writing. Broker shall maintain all rejection notices sent for three (3) years from the date the notice is sent and shall provide Amur with the right to inspect and review those notices and related documents upon seven (7) days written notice. If Customer or any Guarantor requests additional information regarding rejection, Broker shall advise Amur and Amur shall assist Broker with preparation of any additional notice required to be delivered to Customer or Guarantor pursuant to all applicable laws and regulations including the Equal Credit Opportunity Act and Fair Credit Report Act (collectively, the **Credit Regulations**). Broker shall at all times be responsible for delivery of all notices as may be required under the Credit Regulations.

6. **Documentation**
   Upon Acceptance, Amur shall prepare all documents necessary to complete the Transaction consistent with the terms of the Approval (the **Contract Documents**). Contract Documents shall include any modification, amendment or supplement subsequently required by Amur. The Broker shall have responsibility for obtaining all necessary signatures and returning the executed Contract Documents to Amur, together with payments, documentation fees and any other initial payment required thereunder. All Approved Transactions shall be documented to Amur's complete satisfaction; any contract forms used by Broker that are not Amur's approved forms shall be pre-approved by us in our sole discretion.

BROKER AGREEMENT
MMP Capital Inc.

7.  **Closing and Funding**
    Amur shall not be required to close and fund an Approved Transaction (a **Closing**) until (i) Amur receives all required Contract Documents, in satisfactory form and properly executed by the Customer and all Guarantors and (ii) all conditions precedent listed in the Approval have been satisfied.

8.  **Broker Fee**
    The Broker Fee shall be determined solely by reference to Amur's Broker Fee Policy (the **Fee Policy**) in effect at the time the Application is submitted and shall be final and non-appealable. The Broker Fee shall be the sole compensation to Broker from Amur for each Transaction and Broker shall be solely liable for all of Broker's costs and expenses in connection with each Application and Transaction. Broker shall not be entitled to any fee or other compensation for rejected Applications or Transactions that do not go to Closing for any reason. The Fee Policy is subject to change at any time. Broker will be solely responsible for federal, state or local income taxes owed by Broker and for any expenses of any kind as well as salaries, benefits and commissions due to its employees and agents.

9.  **Independent Contractor; Authority of Broker**
    Broker is an independent contractor and not an employee or agent of Amur and there is no partnership, joint venture or similar arrangement or relationship between Amur and Broker. Broker shall have no authority to bind Amur, incur any obligations for or on behalf of Amur and/or modify any Contract Documents. Broker may not use Amur's name, logos, trademarks, trade names, service marks, or other intellectual property.

10. **Broker Representations, Warranties, Covenants and Additional Terms**
    Broker represents to, warrants to, and covenants with Amur and otherwise agrees as follows:

    (a) All information concerning the Broker provided by Broker to Amur (including the information in the application submitted by Broker to be approved as a broker under this Agreement) is accurate and complete and Broker will provide such updated information to Amur from time to time so that such information will remain accurate and complete;

    (b) Broker represents that prior to submitting an Application to Amur, it has (i) obtained a valid and duly executed Credit Authorization from each of Customer, its principal(s) and its Guarantors (and if an entity, its respective principals); and (ii) complied with all laws and regulations related thereto. Broker shall provide written evidence of such Credit Authorization upon request from Amur;

    (c) Each Application, the corresponding Broker Information and all documents signed by Broker shall contain complete and accurate information as well as genuine signature of the parties signing those documents;

    (d) Each Application will represent the entire Transaction and Broker shall disclose to Amur (in writing at the time of submission of the Application) all other applications for credit and/or other equipment financing being sought or processed by Customer and/or the Guarantors at that time (or intends to be sought or processed by them) from any financing source;

    (e) No Transaction shall be divided among various funding sources unless Broker has disclosed such information in writing to, and has been approved by, Amur on or before the Closing;

    (f) Each signature executed by Customer and/or Guarantor is the genuine signature of such signer, binds the signer, is a bona fide obligation of the Customer, Guarantor and/or other third party, respectively and will be valid and enforceable according to its terms;

    (g) ALL TRANSACTIONS SUBMITTED WILL BE FOR BUSINESS OR COMMERCIAL PURPOSES ONLY and not for personal, family, or household purposes;

    (h) Broker is the type of entity set forth herein, and is organized and in good standing in the state set forth herein, and is duly qualified, in good standing in each necessary jurisdiction to carry out any of its obligations under this Agreement and this Agreement has been duly authorized and executed by Broker and represents Broker's valid and legally binding obligation, enforceable against it in accordance with its terms;

    (i) Broker (i) will perform its obligations in good faith and in a professional and ethical manner; (ii) has and will comply with all applicable laws, rules, regulations and orders of all governmental entities and will maintain all appropriate licenses and qualifications applicable and necessary to carry out its business under this Agreement;

    (j) Broker is not in default under any other agreement to which it is a party and there are no claims, litigations, investigations or proceedings pending or, threatened against Broker except as previously disclosed in writing by Broker to Amur. Broker shall notify Amur in writing within ten (10) days of occurrence of any claims, litigations, investigations or proceedings pending or threatened against Broker;

    (k) Broker (i) will be the sole originator of a Transaction that is the subject of the corresponding Application; (ii) is not re-brokering a Transaction; and (iii) will not accept any compensation, commission, rebate or other remuneration or consideration of any kind whatsoever from the Customer, any Guarantor, any vendor and/or any third party with respect to the Transaction except as disclosed in writing to Amur at the time that the corresponding Application is submitted; and

2

BROKER AGREEMENT
MMP Capital Inc.

(iv) will not, directly or indirectly, pay any amount owed by any Customer or Guarantor under any Transaction or Contract Documents, including by way of any loans, advance, reimbursement or rebate;

(l) Broker is independent of all vendors, Customers and Guarantors on each Transaction and all Transactions have been negotiated in good faith and at arms-length by and between the Broker, any vendor, Customer and any Guarantor;

(m) Other than the Broker Fee (if and when earned hereunder), no other fee or compensation of any kind will be due by Amur to Broker or any third party (except for the financing being paid to the vendor(s) with respect to any Transaction);

(n) No Broker Fee will be divided, shared or paid to Customer or Guarantor and, as to any non-Customer and/or non-Guarantor, no Broker Fee will be divided, shared or paid to any other person or entity other than as disclosed in writing by Broker to Amur at the time that the corresponding Application is submitted to Amur;

(o) Broker will not in any manner (written, verbal or otherwise) make any agreements with or statements to Customer that in any way conflict with or purport to modify, supplement or explain the terms of Amur's Approval or any Contract Documents, including with respect to purchase, renewal, early termination or cancellation rights or options, as well as any subsequent modification or amendment to the Approved Transaction required by us;

(p) All Equipment which is the subject of a Transaction will be new, unless otherwise disclosed in writing to Amur at the time the Application is submitted;

(q) Broker will immediately inform Amur in writing of any (i) dispute arising between the Customer, any Guarantor, any vendor and/or Broker, including any actual, pending or threatened suit, demand, counterclaim or set-off; and (ii) assignment for the benefit of creditors, cessation of business or bankruptcy, insolvency or receivership of any Customer, Guarantor or vendor of which Broker has or should have knowledge;

(r) All of Broker's representations, warranties and obligations under this Agreement extend and apply to all Broker's employees, agents, independent contractors and/or other person/entities that provide information to Broker concerning each Application and Transaction.

(s) These representations, warranties, covenants and terms, are continuing and shall survive termination of this Agreement. Broker will provide additional information to Amur as is necessary to maintain and confirm the accuracy and completeness of these representations, warranties, covenants and other agreements provided for in this Agreement.

## 11. Credit and Information Disclosure

Broker confirms that it previously authorized, and hereby authorizes Amur to obtain (at any time from the date the submission of Broker's application to Amur through any termination of this Agreement) any credit, financial, trade and/or business information on Broker from any bank, financial institution, credit reporting agency, trade reference and/or any other person or entity.

## 12. Termination

Either party may terminate this Agreement upon ninety (90) days' written notice to the other, provided, that such termination shall not affect the respective rights and obligations of the parties with respect to all Applications, Transactions and Approved Transactions submitted prior to the effective date of termination. Amur shall have the right (but not the obligation) to take to Closing any Applications, Transactions and Approved Transactions in existence prior to the effective date of termination of this Agreement, even if such Closing occurs after the effective date of termination.

## 13. Default and Remedies

(a) *Broker Default.* Broker will be in default under this Agreement if Broker fails to comply with any of its representations, warranties, covenants or other terms and/or agreements hereunder and such failure is not cured within ten (10) days of written notice from Amur to Broker (a **Default**). Upon any Default, upon Amur's written demand, Broker will purchase such Transaction(s) from Amur for an amount (the **Purchase Price**) equal to the sum of (i) the aggregate amount of all accrued and unpaid Transaction payments and other charges then due by Customer plus the accelerated balance of all future Transaction payments (and if provided under the relevant Contract Documents upon the occurrence of a default thereunder, less a present value discount), (ii) the aggregate amount of the Broker Fee paid to the Broker as of such date and (iii) all Enforcement Costs defined herein. Absent manifest error, Amur's determination of the Purchase Price shall be final, binding and non-appealable. Broker shall pay Amur the Purchase Price in immediately available funds within five (5) business days of such written demand and upon payment, Amur will then convey all of its right, title and interest in and to the Transaction and Collateral to Broker without recourse or warranty of any kind. Upon payment of the Purchase Price, Amur shall assign the corresponding Contract Documents (and any such enforcement efforts, including legal proceedings) to Broker. Any amount of any Broker Fee due but not yet paid to Broker as of the date of any Default shall be deemed cancelled. In the event Broker is assigned Amur's rights under any legal proceeding and/or judgment, Broker shall within thirty (30) days take whatever steps are necessary to change the captions of any legal proceeding or judgment to reflect that Broker is the assignee of Amur under that legal proceeding and/or judgment.

3

BROKER AGREEMENT
MMP Capital Inc.

(b) *Customer Default.* If a Customer fails to make any portion of the first, second or third monthly payment due and payable to Amur following any Closing and such failure continues for ninety (90) days after the respective due date of each such payment, Broker agrees to return to Amur the total amount of the Broker Fee paid to Broker for the applicable Transaction. If a Customer fails to make any portion of the fourth, fifth or sixth monthly payment due and payable to Amur following any Closing and such failure continues for ninety (90) days after the respective due date of each such payment, Broker agrees to return to Amur 50% of the total amount of the Broker Fee paid to Broker for the applicable Transaction. All amounts payable by Broker hereunder shall be paid in immediately available funds within five (5) business days of written demand. Amur shall have the right to set off any amount payable by Broker to Amur hereunder against any other amount payable by Amur to Broker.

(c) *Reservation of Rights.* Upon any event described above, Amur shall also have all of the rights and remedies available under applicable law or in equity. Notwithstanding anything to the contrary, whether or not Broker is in Default, Amur has the right to enforce any Contract Documents against Customer, any Guarantor, any Collateral and/or any other party.

14. **Enforcement Costs**
Enforcement Costs shall refer to all attorney fees, other legal fees, costs and other expenses we incur by reason of any Default or the exercise or preservation of our rights or remedies, in bankruptcy or otherwise, under this Agreement or the Contract Documents (whether or not you, the Customer and/or any Guarantor are in default of this Agreement and/or any Contract Documents, as applicable), including all expenses related to the return, repossession, refurbishing, recovery, advertising, sale, re-lease or other disposition of any Collateral.

15. **Indemnification**
Broker shall indemnify, defend, and hold harmless Amur, its affiliates, and their respective officers, directors, employees, and agents (each, an **Indemnitee**) from and against any and all losses, damages, actions, claims, demands and expenses, including reasonable attorneys' fees, expenses and other Enforcement Costs, which are asserted against or incurred by an Indemnitee and which arise out of (i) Broker's submission of an Application hereunder, (ii) Amur's dealings with any Customer or (iii) any Default by Broker under this Agreement or (iv) any other matter relating to the terms of this Agreement.

16. **Assignment**
(a) You may not assign, delegate or transfer any of your rights or responsibilities under this Agreement, which shall be binding upon you and inure to the benefit of us and our assigns.

(b) We may sell, transfer, assign or otherwise convey to any affiliated or unaffiliated person or entity (an **Assignee**) any or all of our rights, interests and benefits under this Agreement (an **Assignment**), whether in whole or in part, without notice to you or your consent. You acknowledge and agree that, if we make an Assignment: (i) such Assignee shall have the rights and benefits we convey under such Assignment, but not the obligation to perform any of our obligations; (ii) such Assignee's rights shall not be subject to any claims, defenses or set-offs that you may have against us; (iii) you shall perform all the obligations hereunder for the Assignee, if required under such Assignment; and (iv) if so directed by us, you shall acknowledge such Assignment.

17. **Choice of Law and Service of Process**
THIS AGREEMENT, ALL CONTRACT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES THEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEBRASKA (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF ANY CUSTOMER, GUARANTOR AND/OR THE COLLATERAL. THE PARTIES HEREBY AGREE TO THE NONEXCLUSIVE VENUE AND JURISDICTION OF ANY STATE OR FEDERAL COURT PRESIDING IN NEBRASKA FOR ALL ACTIONS, PROCEEDINGS, CLAIMS, COUNTERCLAIMS OR CROSS-CLAIMS ARISING DIRECTLY OR INDIRECTLY, IN CONNECTION WITH, OUT OF, OR IN ANY WAY RELATED TO THIS AGREEMENT, THE CONTRACT DOCUMENTS AND/OR THE COLLATERAL. The provisions of this paragraph are not exclusive insofar as we are concerned and do not prohibit us from commencing any necessary legal action or instituting any appropriate proceeding in any court of competent jurisdiction or venue. You agree that any service of process can be effectuated under applicable law and can also be sufficiently served if sent to you by any nationally recognized overnight delivery service such as Federal Express, UPS, or US Priority Mail Express (each, a **National Delivery Service**) to the address set forth above and deemed complete two (2) business days after the same has been sent as aforesaid.

18. **Waiver of Jury Trial**
EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, COUNTERCLAIM OR CROSS-COMPLAINT IN ANY ACTION OR PROCEEDING TO WHICH IT MAY BE A PARTY

BROKER AGREEMENT
MMP Capital Inc.

REGARDING ANY MATTER WHATSOEVER RELATED TO THIS AGREEMENT, THE CONTRACT DOCUMENTS AND THE COLLATERAL

19. Miscellaneous

(a) *Attorney-in-Fact.* You hereby irrevocably appoint us to be your attorney-in-fact with the power to: (i) sign and file on your behalf any document we deem necessary to perfect, protect or enforce our interest in this Agreement; (ii) make claims for, receive payments under, and execute and endorse all documents, checks or drafts to which we are entitled under this Agreement; (iii) complete any blanks, correct any mistakes and update your contact information in this Agreement; (iv) take any action authorized by this Agreement; and (v) grant any of these powers to any of our agents.

(b) *Amendments and Entire Agreement.* This Agreement may only be amended in writing when signed by all parties hereto. Broker agrees that this Agreement represents the entire agreement between you and us pertaining to the subject matter hereof and of supersedes all prior or contemporaneous agreements, understandings, negotiations and communications concerning the same subject matter.

(c) *Severability.* If any provision or remedy in this Agreement is found to be invalid, the remaining provisions or remedies shall be given effect in accordance with the manifest intent hereof. You agree that a waiver of a Default shall not represent a waiver of any other subsequent Default, and that any delay or failure to enforce our rights does not prevent us from enforcing any rights at a later time.

(d) *Notices.* Notice can be sent to Broker (i) if by hardcopy, at its address set forth herein by any National Delivery Service, with such notice being deemed effective two (2) business days after it is sent; or (ii) if by telecopier or email, with such notice being deemed effective when we send it.

(e) *Communications/Marketing.* You agree that by providing us, now or in the future, with an email address or telephone number for a wireless device, you expressly consent to receiving communications including email, voice and text messages from us or our affiliates or assigns at that email address or telephone number, regardless of their purpose, including marketing, advertising or collection purposes. These calls and messages may be subject to access and/or other fees from your internet or wireless provider. Your consent to this is not a condition of doing business with, or making a purchase of any goods/services from, us. You may unsubscribe or opt-out of any such further telemarketing calls or marketing text messages at any time.

(f) *Survival.* All your obligations and our rights hereunder shall survive the expiration or earlier termination of this Agreement.

(g) *Further Assurances.* Broker will execute and deliver such further documents and perform such further acts as reasonably requested by Amur in order to give effect to the terms and conditions contemplated herein.

(h) *Headings.* Headings are for convenience only.

(i) *Execution.* This Agreement may be executed in separate counterparts which together shall constitute one and the same instrument. This Agreement may be signed electronically or digitally and all signatures transmitted by facsimile, email, digital photograph or other electronic means shall for all purposes be deemed effective, binding, legally admissible and have the same effect as a manually applied ink signature.

SIGNATURES TO FOLLOW ON THE NEXT PAGE

BROKER AGREEMENT
MMP Capital Inc.

## Signature Page to Broker Agreement

| BROKER | MMP Capital Inc. | | AMUR EQUIPMENT FINANCE, INC. | |
|---|---|---|---|---|
| Signature | | | Signature | |
| Name | Michael McCaffrey | | Name | TODD VAINNRVEY |
| Title | Secretary | | Title | VP DIRECTOR OF RISK |

# EXHIBIT C

**From:**  John-Paul M. Smolenski [jp@mmpcapital.com]
**Sent:**  11/15/2024 10:05:12 PM
**To:**  Todd Wainwright [TWainwright@goamur.com]
**CC:**  John-Paul M. Smolenski [jp@mmpcapital.com]
**Subject:**  [External] RE: Potential split transactions review follow up
**Attachments:**  MMP Transaction w Multiple Levels of Exposure - Amur List 11-2024 -.xlsx

Todd,

I went through the remainder.  Notes below.  Based on Amur's numbers, 4.5mm is eligible for refund due to combo deals for 2 different machines that are 100% independent of one another.  Of the deals that are not performing based on Amur's report, 1.6mm are not current (past due, charge off, legal.. not current).  If the customer is current, and paying Amur… I would imagine that Amur just added the deal to the report, but if they are paying… why would they want to sell the deal to MMP.

So really the number is 1.6mm.

Thank you,
JP



## Opportunities — Nardin Hermiz RN

Accounts > Nardin Hermiz RN

14 items • Sorted by Close Date • Updated a minute ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... ↑ | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Nardin Hermiz RN - 150k Emsculpt Neo | $165,206.68 | Christopher Hagmaier | Closed Won | 9/14/2021 | Quality Leasing | | EFA | Current |
| 2 | Nardin Hermiz RN - 139k Emsella | $152,978.00 | Christopher Hagmaier | Closed Won | 9/21/2021 | MMP Capital | Amur Equipment Fina... | EFA | Past Due |
| 3 | Nardin Hermiz RN - 40k Working Capital | $40,000.00 | Christopher Hagmaier | Closed Lost - No Purchase | 11/30/2021 | | | Working Capital | Current |
| 4 | Nardin Hermiz RN - 100k Emtone - LA EVENT | $110,390.00 | Christopher Hagmaier | Closed Won | 12/14/2021 | MMP Capital | North Mill Equipment ... | EFA | Current |
| 5 | Nardin Hermiz RN - 50K LOC | $50,000.00 | Jon McGibbon | Closed Lost - No Purchase | 3/4/2022 | | | Working Capital | Current |
| 6 | Nardin Hermiz RN - 89k Sylfirm X Ultimate Edition | $89,900.00 | Jon McGibbon | Closed Won | 4/18/2022 | MMP Capital | Slim Capital | EFA | Current |
| 7 | Nardin Hermiz RN - 159k LaseMD Ultra | $159,447.00 | Robert Naughton-frozen | Closed Lost | 5/24/2022 | MMP Capital | Dext Capital | EFA | Current |
| 8 | Nardin Hermiz RN - 675k SBA | $675,000.00 | Jon McGibbon | Closed Won | 6/2/2022 | | | Working Capital | Current |
| 9 | Nardin Hermiz RN - 125k Clarity 2 | $135,563.75 | Corey Aronoff | Closed Won | 10/14/2022 | MMP Capital | Dext Capital | EFA | Current |
| 10 | Nardin Hermiz RN - 90k - Genius | $96,043.20 | Corey Aronoff | Closed Lost - No Purchase | 12/30/2022 | Quality Leasing | | EFA | |
| 11 | Nardin Hermiz - 50k Working Capital | $50,000.00 | Corey Aronoff | Closed Won | 1/31/2023 | | | Working Capital | |
| 12 | Nardin Hermiz RN - Working Capital | $50,000.00 | Ryan Graziano | Closed Lost - Credit | 4/14/2023 | | | Working Capital | |
| 13 | Nardin Hermiz RN - 90k Ultra | $98,572.25 | Corey Aronoff | Closed Lost | 4/28/2023 | TempPayment | | EFA | |
| 14 | Nardin Hermiz RN - SBA Loan | $650,000.00 | Ryan Graziano | Closed Lost - Credit | 8/10/2023 | | | SBA | |

## Opportunities — Lina Haisha

Accounts > Lina Haisha

8 items • Sorted by Close Date • Updated a few seconds ago

| | Opportunity Name | Total Amo... | Opportunity Manager | Stage | Close D... ↑ | Underwriter | Assignee | Product Type | Payment S... |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Beauty Clinic - Handpiece | $22,000.00 | Mike McCaffrey | Closed Won | 10/31/2017 | Pioneer Leasing | | EFA | Current |
| 2 | The Beauty Clinic - 55K Lightsheer | $27,500.00 | Mike McCaffrey | Closed Won | 1/29/2018 | Financial Pacific | | EFA | Current |
| 3 | The Beauty Clinic - GentleMax or UltraVenus | $70,000.00 | Shamus Naughton | Closed Lost - Competitor | 6/25/2019 | | | | |
| 4 | The Beauty Clinic - 30K Legend & OxyGeneo | $35,253.86 | Shamus Naughton | Closed Lost - Competitor | 7/2/2019 | BSB Leasing | | EFA | |
| 5 | The Beauty Clinic - 30K Diamond Glow & Zimmer Chiller | $30,000.00 | Shamus Naughton | Closed Lost - No Purchase | 11/30/2020 | | | EFA | Current |
| 6 | Lina Haisha - 65k Splendor X | $92,114.00 | Corey Aronoff | Closed Won | 10/23/2021 | Quality Leasing | | EFA | Current |
| 7 | Lina Haisha - 159k Emsculpt Neo | $169,907.40 | Corey Aronoff | Closed Won | 11/5/2021 | Amur Equipment Finan... | Amur Equipment Fina... | EFA | Current |
| 8 | Lina Haisha - 180k Emsculpt Neo*** DETROIT EVENT | $192,167.40 | Christopher Hagmaier | Closed Lost | 1/20/2022 | | | EFA | Current |







**John-Paul M. Smolenski**
President & CEO

e: jp@mmpcapital.com
o: (516) 454-4572 | m: (516) 606-8354 | f: (516) 400-2071

*"Success is not owned, it's leased, and rent is due everyday." – J.J. Watt*

       

 

 

**From:** John-Paul M. Smolenski <jp@mmpcapital.com>
**Sent:** Thursday, November 14, 2024 6:03 PM
**To:** Todd Wainwright <TWainwright@amuref.com>
**Cc:** John-Paul M. Smolenski <jp@mmpcapital.com>
**Subject:** RE: Potential split transactions review follow up

Todd,

I am going through the list…. As of now, I am 20 deals through the list.  About half were combo deals with Amur & NMEF.







**John-Paul M. Smolenski**
President & CEO

**e:** jp@mmpcapital.com
**o:** (516) 454-4572 | **m:** (516) 606-8354 | **f:** (516) 400-2071

*"Success is not owned, it's leased, and rent is due everyday." – J.J. Watt*









**From:** Todd Wainwright <TWainwright@amuref.com>
**Sent:** Monday, November 11, 2024 1:35 PM
**To:** John-Paul M. Smolenski <jp@mmpcapital.com>
**Cc:** Todd Wainwright <TWainwright@amuref.com>
**Subject:** Potential split transactions review follow up

JP –

As a follow up to our prior conversation, attached is a list of additional transactions that Andrea and the team have identified as split transactions using UCC filings. The data set they reviewed consists of:

- Transactions originated after 8/1/24 (this was around the date of the prior buybacks that MMP completed with Amur)
- Charge offs (as identified) – note: the C/O figure does not incorporate any recovery which would obviously be adjusted for
- Currently delinquent transactions

While this isn't necessarily a complete list of split transactions, it should serve as a significant starting point to a conversation to discuss a go-forward strategy. We should plan to sit down as soon as possible to try to find a workable path forward and will of course review any evidence that any of these transactions were not split. The rest of our exec team is open on Friday 11/22 if we could schedule time in our White Plains office to meet. Let me know as soon as you can on that date so we can get it on the calendar.

Side note – I see Dale will be at the NEFA conference in Indy this week – any chance you'll be in attendance?

Talk soon,

Todd

**Todd Wainwright**
Senior Vice President, Head of Commerce & Strategic Partnerships

| | |
|---|---|
| *direct* | 308-398-7180 |
| *fax* | 308 398-7180 |
| *toll free* | 800-994-0016 ext. 2400 |

TWainwright@amuref.com
www.goamur.com



Legal Disclaimer: The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the Sender immediately by replying to the message and delete this email from your system.

MMP Capital

| Contract | Customer Name | Booking Date | Aging Status Nov-2024 | Amount | NBV | Vendor | Situation | Aging Status 11/3/242 | Oldest Rent | Additional Exposure | Payment Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1223367 | Revival Health Group, P.A. | 10/29/2024 | Active | | $272,967 | BTL Industries, Inc. | Other UCCs filed on same day as Amur's | Current | 11/15/2024 | No | Current |
| 1225821 | Tampa Sports & Wellness Chiropractic, LLC | 10/25/2024 | Active | | $240,404 | BTL Industries, Inc. | Other lender (Marlin Leasing) within 4 days of Amur's filing | Current | 11/15/2024 | No | Current |
| 1219152 | IV Essentials LLC | 9/27/2024 | Active | | $349,780 | BTL Industries, Inc. | Other filing under Guarantor name for the same filing date | Current | 11/15/2024 | No | Current |
| 1219833 | Maureen Louise O'Flanagan, D.D.S., P.A. | 9/18/2024 | Active | | $295,436 | BTL Industries, Inc. | Other UCC with Marlin Leasing Corp within 6 days of Amur's UCC filing | Current | 11/15/2024 | No | Current |
| 1217045 | Southwest Florida Spine and Joint Inc | 8/30/2024 | Active | | $351,384 | BTL Industries, Inc. | Other UCC with Marlin Leasing Corp on same day as Amur's UCC filing | Current | 11/15/2024 | Yes, but 2 months later. | Current |
| 1202248 | Shenandoah Medical Center "LLC" | 6/11/2024 | Active | $235,902 | $235,902 | BTL Industries, Inc. | UCC filing on the same day for Amur and North Mill. Also, more filings in the months prior and subsequent to ours.  On 10/28/24, notified us ofintent to surrender four pieces of equipment financed in mid-2024: Emsella (NMEF), Emsculpt Neo tower (Amur), Exion/Emface (MMP) and Cellutone (Dext Capital). | 31-60 days | 10/1/2024 | Yes.  MMP did a combo deal with NMEF and Amur. | Past Due - Legal |
| 1187962 | Indigo Medicine, LLC | 3/22/2024 | Active | $235,684 | $235,684 | BTL Industries, Inc. | UCC by North Mill filed on same date as Amur; Customer filed suit against MMP/BTL | Current | 12/15/2024 | Yes. Combo w/ NMEF. | Current |
| 1175480 | Dominick P. Artuso M.D., P.C. | 3/14/2024 | Active | $288,487 | $288,487 | BTL Industries, Inc. | North Mill filed UCC same day as Amur | 30-60 days | 10/1/2024 | Yes. Combo w. NMEF | Current |
| 1172135 | Margaret Novicio D.D.S., Professional Corporation | 12/28/2023 | Active | $205,157 | $205,157 | BTL Industries, Inc. | UCC filing with HIL financial on same day. Paynet showing financed equipment. | Current | 12/15/2024 | Yes. Combo w/ NMEF | Current |
| 1173382 | Shruti Panjini, DDS, P.C. | 12/26/2023 | Active | $256,677 | $256,677 | BTL Industries, Inc. | PG filed for Ch. 7. Website of dental practice (now allegedly closed) advertises BTL Emface financed by Amur and BTL Exion. UCC filings from Amur and North Mill on same date 12/20/23; POC also proves MMP handled both Contracts | 11-30 days | 10/15/2024 | Yes. Combo w/ NMEF | BK |
| 1149042 | Serene Dental Solutions, LLC | 8/17/2023 | Active | $290,818 | $290,818 | BTL Industries, Inc. | UCC with North Mill filed on same day | 30-60 days | 9/15/2024 | Yes. Combo w/ NMEF | Past Due |
| 1123758 | Seabreeze Medical, P.A. | 5/16/2023 | Charged-off | | $167,186 | BTL Industries, Inc. | Additional UCC filings within days of Amur | BADDEBT | 5/15/2024 | Have 4 Levels of Exposure, but not simultaneous. | Legal - Customer is going to lose in court. |
| 1131793 | John R. Kearney, M.D., Eye Physician And Surgeon, P.C. | 4/28/2023 | Active | $223,594 | $223,594 | BTL Industries, Inc. | UCC/North Mill filed 8 days after Amur's filing | Current | 11/15/2024 | Yes. Combo w/ NMEF. | Legal w/ NMEF. |
| 1128877 | William F. McGrogan, M.D. PLLC | 3/31/2023 | Active | $289,051 | $289,051 | BTL Industries, Inc. | Multiple UCC's filed w/ MMP, Signature, and North Mill at the same time as Amur's filing. | 31-60 days | 9/15/2024 | Yes. Not simultaneous | |
| 1125029 | Personal Healthcare Of Naples LLC | 3/21/2023 | Charged-off | | $214,049 | BTL Industries, Inc. | North Mill/MMP Capital have filings around same day | RECOVEREDASSET | 12/1/2024 | Yes. Combo w/ NMEF. | |
| 1121335 | Internal Medicine Prime Care LLC | 2/28/2023 | Charged-off | | $109,776 | BTL Industries, Inc. | UCC filing with North Mill within a couple days of Amur's filing | BADDEBT | | Yes. Combo w/ NMEF | |
| 1121114 | East Carolina Optometric Care, PA | 2/21/2023 | Charged-off | | $153,727 | BTL Industries, Inc. | Amur contract signed 2/10/23 - cellutone workstation. MMP split transactions between North Mill and Amur. Third Party Complaint filed against North Mill, Amur, BTL, MMP seeking relief and damages.  Both contracts signed February 10, 2023. | BADDEBT | 8/1/2024 | Yes. Combo w/ NMEF | Customer in legal, trying to back out of the deal. |
| 1105124 | Island Medical Laser, P.C. | 11/28/2022 | Charged-off | | $169,840 | BTL Industries, Inc. | Cellutone machine; UCC lists a BTL Emface system (usually part of the Cellutone package) financed at around the same time. | RECOVEREDASSET | 11/15/2024 | No. | |
| 1101004 | Premier Wellness & Aesthetics Center, PC | 9/29/2022 | Charged-off | | $278,856 | BTL Industries, Inc. | ReadyCap Lending, LLC filed 2 days after Amur's filing, appears to be a blanket lien filing. | BADDEBT | 12/15/2024 | No. | |
| 1100293 | Naples Direct Medical PLLC | 9/27/2022 | Charged-off | | $214,896 | BTL Industries, Inc. | Amur contract signed 9/17/22 (@Andrea, Dext with MMP/Lumeris signed a contract 9/17/22-found on Center for Alternative Medicine | RECOVEREDASSET | 1/15/2024 | No. | |
| 1101013 | William V. Choisser, M.D. P.A. | 9/22/2022 | Active | $86,346 | $86,346 | BTL Industries, Inc. | Amur filed UCC on 9/22/22 for Cellutone; North Mill filed on the same day, Signature Bank UCC on 9/20/22, Leaf Capital on 9/27/22 | Current | 11/15/2024 | Yes. Combo w/ NMEF | |

| Contract | Customer Name | Booking Date | Aging Status Nov-2024 | Amount | NBV | Vendor | Situation | Aging Status 11/3/242 | Oldest Rent | Additional Exposure | Payment Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1055636 | Center For Alternative Medicine, PLLC | 8/24/2022 | Charged-off | | $272,707 | BTL Industries, Inc. | Amur contract signed 8/6/22 (Dext with MMP/Lumeris signed 9/17/22; NEC two contracts signed 2/2/23 with MMP/BTL; Northmill MMP/BTL signed 12/20/20)  UCC filings by Amur and Dext on same date 8/9/22 | BADDEBT | 10/15/2023 | Yes.  Combo w/ NEC Financial.  This customer defrauded Dr. Kerry Latch, and ran up all his debts, and went off the grid. | |
| 1088953 | Stanley Librach, M.D., D.D.S., LLC | 8/5/2022 | Active | | $210,082 | BTL Industries, Inc. | MMP filed UCC 6 days prior to Amur.  Customer confirmed there was 3 machines financed with MMP at the same time.  Amur contract signed  6/27/22 | 11-30 days | 10/15/2024 | No.  Simultaneous debt over a period of time.  MD went to jail about 3 months ago and defaulted on all EFA's. | |
| 1084810 | Allyson Berkey MD PC | 6/29/2022 | Active | $104,126 | $104,126 | BTL Industries, Inc. | Amur contract signed 6/15/22 and UCC filed on 6/20 for an Emsella.  NorthMill filed a UCC on 6/16 most likely for an Emsculpt; once we confirm NorthMill's contact was originated by MMP, it will qualify for buyback. | Current | 12/15/2024 | Yes.  Combo w/ NMEF. | |
| 1080831 | Derek L. Martin, DMD, Inc. | 6/16/2022 | Active | $205,326 | $205,326 | BTL Industries, Inc. | North Mill filed UCC same day | 11-30 days | 10/15/2024 | Yes.  Combo w/ NMEF. | |
| 1078062 | Ryan Francis Ramos MD PLLC | 6/15/2022 | Charged-off | | $247,325 | BTL Industries, Inc. | MMP/North Mill filed UCC same day | BADDEBT | 11/15/2024 | No.  Exposure outside of same period. | |
| 1083209 | Genera Health Direct LLC | 6/7/2022 | Charged-off | $114,173 | $114,173 | BTL Industries, Inc. | North Mill/MMP filed same day | BADDEBT | 11/1/2024 | Combo deal with NMEF. | |
| 1081988 | MyMD Direct, PLLC | 6/2/2022 | Charged-off | $218,252 | $218,252 | BTL Industries, Inc. | Amur contract signed 5/20/2022; Signature Financial MMP/BTL signed 6/16/2022; North Mill MMP/BTL POC signed 5/18/2022 | RECOVEREDASSET | 3/1/2023 | Yes.  Combo w/ NMEF and Flagstar in the same month. | |
| 1074381 | Utopic Health Pllc | 4/15/2022 | Charged-off | | $236,941 | BTL Industries, Inc. | Amur UCC filed 4/14/2022, POC filing in Medical Healing Center shows North Mill contract signed 4/9/22 | RECOVEREDASSET | 6/15/2024 | No. | |
| 1070992 | The Health Studio & IV Spa, LLC | 4/5/2022 | Active | | $92,231 | BTL Industries, Inc. | North Mill/MMP filed UCC same day | 31-60 days | 10/1/2024 | Combo deal.  Customer went through a divorce, and is on hardship deferral with MMP, and will come back and get | |
| 1057454 | Infinity Orthodontics P.C. | 2/1/2022 | Active | $127,475 | $127,475 | BTL Industries, Inc. | UCC filing for MMP same date as Amur 2/1/2022 - appears to be assigned to North Mill | 31-60 days | 10/1/2024 | Combo deal w/ NMEF a few days later. | |
| 1058967 | Full Motion Orthopaedics & Wellness Center, LLC | 1/25/2022 | Active | $169,531 | $169,531 | BTL Industries, Inc. | North Mill/MMP filed UCC same day | 120+ | 5/15/2024 | Combo deal w/ NMEF. | |
| 1051166 | The Bienetre Center LLC | 12/15/2021 | Charged-off | | $181,436 | BTL Industries, Inc. | UCCs filed around the same time as Amurs-Legal-Kye | RECOVEREDASSET | 9/15/2023 | No. | |
| 1049701 | Cosmo Contour & Spa LLC | 11/30/2021 | Charged-off | | $180,140 | BTL Industries, Inc. | MMP filed within a day of Amur's filing | RECOVEREDASSET | 7/15/2024 | No. | |
| 1049573 | Medical Healing Center, LLC | 11/30/2021 | Charged-off | | $135,980 | BTL Industries, Inc. | Amur contract signed 10/26/21; Dext Capital MMP/BTL POC filed - contract signed 10/26/21/ North Mill MMP/BTL POC filed - signed 10/26/21 / North Mill MMP/BTL POC filed - signed 4/9/22; Balboa MMP/BTL POC filed 12/6/21 | BADDEBT | 6/1/2024 | No.  Customer purchased a 2nd device 2 weeks later and financed with NMEF.  Then financed again a 3rd device 2 weeks after that.  Than again 3 months later.  None of the deals were combo deals.  Customer got diagnosed with cancer, and shut down her practice. | |
| 1048619 | The Beauty Clinic, Inc. | 11/5/2021 | Active | | $170,904 | BTL Industries, Inc. | Amur contract signed 10/20/21 (within 6 days of Medical Healing Center Contracts) | Current | 12/1/2024 | No.  Customer purchased a 2nd device 2 weeks later with another vendor.  Not a combo deal. | |
| 1041062 | Uptown Medispa - Arrowhead LLC | 10/1/2021 | Active | | $111,947 | BTL Industries, Inc. | Amur contract signed 9/27/21.  Quality Leasing signed on 9/7/21. Subsequent financings from North Mill and others. | Current | 12/1/2024 | No.  Customer purchased a device 1 week later with Amur on a discount after having early success with the Neo.  Purchased a 3rd device 3 months later.  Current on all other | |
| 1044665 | Samantha S. Lindsay, M.D., P.A. | 9/29/2021 | Charged-off | $202,890 | $202,890 | BTL Industries, Inc. | Amur contract signed 9/18/21; Flagstar and North Mill contracts signed 9/18/21 (found from Winter Garden bk) | BADDEBT | 11/15/2024 | Combo deal with NMEF. | |
| 1032913 | Donald G Blaschke II, M.D. | 8/17/2021 | Charged-off | | $174,683 | BTL Industries, Inc. | Amur contract signed 6/27/21 - Another contract signed 6/26/2021 BTL as vendor for an Emsculpt Neo Workstation (assume North Mill as copy of check payable to North Mill) | BADDEBT | 6/1/2022 | Customer purchased 2 other devices at a huge discount after purchasing his Emsculpt Neo.  Customer didn't do as well as anticipated, and fabricated stories to try to get out of the deal.  MMP was lumped into a lawsuit with NMEF, and customer lost bc he his claims were frivolous, without merit, | |
| 1036445 | Wayne P. Justice, M.D., P.A. | 8/9/2021 | Charged-off | $220,177 | $220,177 | BTL Industries, Inc. | North Mill filed within days of Amur's filing | RECOVEREDASSET | 4/1/2024 | Combo deal with NMEF. | |
| 1029822 | Specialty Solutions, LLC | 7/28/2021 | Charged-off | $94,569 | $94,569 | BTL Industries, Inc. | North Mill filed within days of Amur's filing | BADDEBT | 2/15/2024 | Combo deal with NMEF. | |
| 1030836 | Bespoke Wellness LLC | 7/6/2021 | Active | $56,459 | $56,459 | BTL Industries, Inc. | North Mill / MMP filings on same day | 11-30 days | 10/15/2024 | Customer made frivolous claims against MMP, and all claims were thrownout.  Customer is current with all other sources. | |
| 1027914 | TMMD LLC | 6/8/2021 | Charged-off | $142,212 | $142,212 | BTL Industries, Inc. | | BADDEBT | 8/1/2024 | Combo deal with NMEF. | |
| 1027925 | VivaMD LLC | 6/8/2021 | Charged-off | $84,112 | $84,112 | BTL Industries, Inc. | I believe we can collect the rest of this one through KYE, balance on account is only showing $26,872.71. North Mill filed UCC within a couple days of Amur's filing | RECOVEREDASSET | 10/1/2022 | Combo deal with NMEF. | |

| Contract | Customer Name | Booking Date | Aging Status Nov-2024 | Amount | NBV | Vendor | Situation | Aging Status 11/3/242 | Oldest Rent | Additional Exposure | Payment Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1026146 | Total Woman Healthcare, P.A. | 5/26/2021 | Active | $115,885 | $115,885 | BTL Industries, Inc. | MMP/Leasepoint have UCC filings within days of Amur's filing | Current | 12/15/2024 | Combo deal with NMEF. | |
| 1014853 | Island Family Health LLC | 3/2/2021 | Charged-off | $53,506 | $53,506 | BTL Industries, Inc. | Amur Contract signed 2/17/21 / Northmill filed POC-contract with MMP/BTL signed 2/23/21 (Other POCs filed:  MMP filed POC-contract signed 7/2022 / Flagstar Financial w/MMP filed POC-contract signed 5/26/21 / Northmill filed POC-contract with MMP signed 3/7/23) | BADDEBT | 4/1/2024 | Combo deal with NMEF.  Cusomter was doing over 2.5mm per year, and hired an attorney to try and wiggle out of contracts to make more money.  Filed for BK, got declined, MMP holds debt with PG as well, and will collect once settled. | |
| | | | | $4,497,960.00 | | | | | | | |