**HAINES LAW GROUP, APC**
Paul K. Haines (SBN 248226)
*phaines@haineslawgroup.com*
Fletcher W. Schmidt (SBN 286462)
*fschmidt@haineslawgroup.com*
Ian T. Mallery (SBN 359132)
*imallery@haineslawgroup.com*
2155 Campus Drive, Suite 180
El Segundo, California 90245
Tel: (424) 292-2350
Fax: (424) 292-2355
*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHADI KRANITZ, an individual; and DR. SHADI CONCIERGE MEDSPA, a California Corporation; NICOLE KING, an individual; COSMO CONTOUR & SPA LLC, a California limited liability company; JENNIFER TABIZA, an individual; JENNIFER TABIZA OPTOMETRIST, APC, a California professional corporation, *on behalf of themselves and all others similarly situated*,<br><br>              Plaintiffs,<br><br>v.<br><br>BTL Industries, Inc., a Delaware Corporation; MMP CAPITAL, INC., a New York Corporation; DEXT CAPITAL, LLC, a Delaware limited liability company; TIMEPAYMENT CORP., a Delaware Corporation; NORTH MILL CREDIT TRUST, a Delaware Association; AMUR EQUIPMENT FINANCE, INC., a Nebraska corporation; and DOES 1-10, inclusive,<br><br>              Defendants. | Case No. 8:25-cv-1587-DOC-JDE<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT DEXT CAPITAL, LLC'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) [ECF 50]**<br><br>Date: March 30, 2026<br>Time: 8:30 a.m.<br>Courtroom: 10A<br>Judge: Hon. David O. Carter<br>(Ronald Reagan Federal Building and United States Courthouse, Santa Ana) |

# **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND ........................................................................... 3

III. ARGUMENT .................................................................................................. 6

  A. Plaintiffs Adequately Allege Vicarious Liability .................................... 6

    1. Dext Was in a Joint Venture with MMP and BTL ............................. 6

    2. The FAC Adequately Alleges Vicarious Liability Under Agency Principles ... 8

  B. Plaintiffs Adequately Allege Direct Liability Against Dext ................... 9

    1. Plaintiffs State a Claim for Breach of Fiduciary Duty Against Dext ............... 9

    2. Plaintiffs State a Claim for Fraudulent Concealment or Omission Against Dext
........................................................................................................... 10

    3. Plaintiffs State a Claim for Dext's Direct Liability for Breach of Contract and
Failure of Consideration ................................................................... 12

    4. Plaintiffs State a Claim that Dext Violated the UCL ...................... 13

      a. Plaintiffs State a Claim Under the "Unlawful" Prong ......................... 14

      b. Plaintiffs State a Claim Under the "Unfair" Prong ............................... 15

      c. Plaintiffs State a Claim Under the "Fraudulent" Prong ....................... 16

    5. Plaintiffs State a Claim for Rescission Against Dext ...................... 17

    6. The FAC is Not an Improper Collateral Attack on a Prior Judgment ............ 18

      a. The Oregon Judgment was a Default Judgment that Did Not Adjudicate
Plaintiff's Claims ...................................................................... 18

      b. The Jurisdictional Competency Exception Bars Claim Preclusion ....... 19

      c. Fraud Vitiates Judgments Obtained Through Fraudulent Means .......... 19

      d. Full Faith and Credit Does Not Extend the Oregon Judgment Beyond Its
Proper Scope ............................................................................ 20

    7. The Contractual Waivers of Defenses Cannot be Enforced as the Contracts are
Illusory ............................................................................................ 20

    8. Dext is a Required Party Under Rule 19 ......................................... 23

a. Complete Relief Requires Dext's Presence ............................................ 23

b. Dext's Interests Would Be Impaired by Its Absence ............................ 23

c. Inconsistent Obligations Would Result Without Dext ........................... 23

IV. CONCLUSION ............................................................................................ 24

PLAINTIFFS' OPPOSITION TO DEFENDANT DEXT'S MOTION TO DISMISS

# TABLE OF AUTHORITIES

## Federal Cases

*Arizona v. California*
    530 U.S. 392 (2000) ........................................................................ 18

*Asarco, LLC v. Union Pac. R.R. Co.*
    765 F.3d 999 (9th Cir. 2014)........................................................... 21

*Celador Int'l Ltd. v. Walt Disney Co.*
    347 F.Supp.2d 846 (C.D. Cal. 2004) ............................................ 6, 8

*Deteresa v. Am. Broad. Companies, Inc.*
    121 F.3d 460 (9th Cir. 1997)............................................................11

*Donadio v. Hyundai Motor Am.*
    751 F.Supp.3d 1013 (C.D. Cal. 2024) ........................................ 15, 16

*Durnford v. MusclePharm Corp.*
    907 F.3d 595 (9th Cir. 2018)........................................................... 21

*Feminist Women's Health Center v. Codispoti*
    63 F.3d 863 (9th Cir. 1995)............................................................. 19

*Garcia v. Sony Computer Entm't Am., LLC*
    859 F.Supp.2d 1056 (N.D. Cal. 2012) ........................................... 15

*Harris v. County of Orange*
    682 F.3d 1126 (9th Cir. 2012)......................................................... 19

*In re Palmer*
    207 F.3d 566 (9th Cir. 2000)........................................................... 18

*J. C. Millett Co. v. Park & Tilford Distillers Corp.*
    123 F. Supp. 484 (N.D. Cal. 1954) ................................................ 13

*Jensen v. Brown*
    131 F.4th 677 (9th Cir. 2025) ......................................................... 21

*Los Altos El Granada Investors v. City of Capitola*
    583 F.3d 674 (9th Cir. 2009)........................................................... 20

*Marrese v. American Academy of Orthopaedic Surgeons*
    470 U.S. 373 (1985) ................................................................. 19, 20

*Radus Tek Servs., Inc. v. IDC Techs. Inc.*
    767 F.Supp.3d 972 (N.D. Cal. 2025) .............................................. 10

*Smith v. Bayer Corp.*

564 U.S. 299, 313 (2011)..................................................................... 2

*Terpin v. AT And T Mobility LLC*
118 F.4th 1102 (9th Cir. 2024)...........................................................11, 12

*Underwriters Nat'l Assurance Co. v. N.C. Life & Accidental Health Ins. Guar. Ass'n*
455 U.S. 691 (1982) ........................................................................... 20

**<u>Federal Rules</u>**

28 U.S.C. § 1738 .................................................................................. 20

**<u>State Cases</u>**

*Boschma v. Home Loan Ctr., Inc.*
(2011) 198 Cal. App. 4th 230 ....................................................... 14, 16

*Cahill Bros. v. Clementina Co.*
(1962) 208 Cal. App. 2d 367 ............................................................... 7

*California Bank & Trust v. DelPonti* 232
(2014) Cal.App.4th 162 ..................................................................... 22

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*
(1999) 20 Cal.4th 163 ........................................................................ 14

*Cochrum v. Costa Victoria Healthcare, LLC*
(2018) 25 Cal.App.5th 1034 ................................................................ 9

*Fitzgerald v. Herzer*
(1947) 78 Cal.App.2d 127 .................................................................. 18

*Guerrero v. Department of Corrections & Rehabilitation*
(2018) 28 Cal.App.5th 1091 ............................................................... 19

*In re Tobacco II*
(2009) 46 Cal.4th 298 ........................................................................ 16

*LiMandri v. Judkins*
(1997) 52 Cal.App.4th 326 .................................................................11

*Manderville v. PCG&S Group, Inc.*
(2007) 146 Cal.App.4th 1486 ............................................................. 21

*Marzec v. California Public Employees Retirement System*
(2015) 236 Cal.App.4th 889 .........................................................17-18

*Mattei v. Hopper*
(1958) 51 Cal. 2d 119 ........................................................................ 13

*McClain v. Octagon Plaza, LLC*

iv

(2008) 159 Cal.App.4th 784 ........................................................................ 21

*Mitchell v. Jones*
(1959) 172 Cal.App.2d 580, 586 ......................................................... 18

*Nelson v. Abraham*
(1947) 29 Cal.2d 745 ...................................................................... 6

*Orosco v. Sun-Diamond Corp.*
(1997) 51 Cal. App. 4th 1659 .............................................................. 8

*Title Insurance and Trust Co. v. California Development Co.*
(1915) 171 Cal. 173 ....................................................................... 10

*Wells Fargo Bank Minnesota, N.A. v. B.C.B.U.*
(2006) 143 Cal.App.4th 493 .............................................................. 22

**State Statutes and Rules**

Cal. Civ. Code § 1668 ...................................................................... 22

Cal. Civ. Code § 1689 ...................................................................... 17

Civ. Code, § 2856 .......................................................................... 22

**Unpublished Cases**

*Hughes v. Apple, Inc.*
No. 22-CV-07668-VC
2024 WL 4828072 (N.D. Cal. Nov. 18, 2024) ............................................. 15-16

## OPPOSITION

Plaintiffs Dr. Shadi Kranitz, Nicole King, and Jennifer Tabiza and their respective small businesses (collectively "Plaintiffs") hereby submit the following Opposition to Defendant Dext Capital, LLC's ("Dext") Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (referred to herein as the "Motion").

## I.    INTRODUCTION

Plaintiffs and putative class representatives Dr. Shadi Kranitz, Nicole King, and Jennifer Tabiza and their respective small businesses (collectively "Plaintiffs") are owners of med spa businesses in California. They were deceived into buying expensive medical devices from Defendant-Non-Movant BTL Industries, Inc. ("BTL") that BTL required to be financed through its financing partners, including Defendants Dext, MMP Capital, Inc. ("MMP") Amur Equipment Finance, Inc. ("Amur"), and North Mill Credit Trust ("North Mill").

Plaintiffs have alleged that Defendants are acting as agents of one another and/or are in a joint venture relationship. FAC at ¶¶ 27-29. Plaintiffs have also learned since filing the FAC that all of the financing defendants (MMP, Dext, North Mill, and Amur) are in the business of creating asset-backed securities that they sell to institutional investors, that are backed by the equipment finance loans entered into by Plaintiffs and the putative class members here. *See* Declaration of Fletcher W. Schmidt ("Schmidt Decl."), at ¶¶ 3-7 and Exhibits B-G. In fact, Dext itself has issued in excess of $1 billion in asset backed securities, backed by "small- and middle-ticket healthcare and technology equipment leases" just like the Equipment Finance Agreements ("EFAs") signed by Plaintiffs here. *Id*., at ¶ 6 and Exhibits D & E. In order to satisfy its demand for EFAs to bundle and sell as securities, Dext enlisted the services of MMP to act as a broker to originate and assign new EFAs to Dext in exchange for a brokerage fee, and Dext executed a broker agreement with MMP to this effect. FAC at ¶ 63 and Exhibit A. To satisfy the tremendous demand from the financing Defendants for new EFAs, MMP became a fixture at BTL sales events and paid kickbacks to BTL salespeople in order to

PLAINTIFFS' OPPOSITION TO DEFENDANT DEXT'S MOTION TO DISMISS

remain the preferred financing partner to BTL. FAC at ¶¶ 60 & 98. MMP also threw all underwriting guidelines out the window and aggressively originated EFAs from Plaintiffs and members of the putative class with virtually no regard for the borrower's creditworthiness. FAC at ¶ 64. MMP's aggressiveness also required it to engage in the practice of "split" financing, whereby MMP would approve a borrower for a total debt in excess of what the borrower qualified for, and would then split the transaction into two smaller transactions and immediately assign each smaller transaction to a different financing company in order to diffuse the risk of default across all Defendants. FAC at ¶¶ 67-71. This risk of default was then further diffused by the financing Defendants when they bundled and sold the EFA obligations to institutional investors as asset-backed securities.

Plaintiffs were ensnared in this scheme, fraudulently induced into EFAs by false promises of high revenue, marketing support, and market protections that never materialized FAC at ¶¶ 41-52. Despite the BTL devices' inability to generate revenue, Plaintiffs are now bound by draconian financing contracts with personal guarantees, aggressively enforced by Dext, Amur, and North Mill. This ongoing enforcement has led to business closures and bankruptcies.

Plaintiffs seek rescission of these contracts due to BTL's numerous false representations, and injunctive relief to halt enforcement of the fraudulently procured EFAs by Dext, Amur, and North Mill. Such relief is critical to prevent further business closures and bankruptcies. As a direct party to the contracts Plaintiffs seek to rescind and enjoin, Dext is a required party under Rule 19. A court's judgment is binding only on parties to a suit, a foundational principle underscored in *Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) ("The injunction issued here runs into another basic premise of preclusion law: A court's judgment binds only the parties to a suit, subject to a handful of discrete and limited exceptions."). Without Dext's presence, any judgment granting rescission or injunctive relief would be ineffective and fail to provide Plaintiffs with adequate relief.

PLAINTIFFS' OPPOSITION TO DEFENDANT DEXT'S MOTION TO DISMISS

Dext cannot credibly disclaim knowledge of BTL and MMP's fraudulent tactics, from which it continues to reap benefits. On June 24, 2024, Dext itself filed a Complaint against MMP in Clackamas County, Oregon, seeking damages related to the "split" financing scheme. *See* Motion (ECF 50-1) at 4:1-4. Despite this knowledge, Dext persistently enforces these EFAs, collecting monthly payments and obtaining default judgments against class members, including Plaintiff King in December 2024 *Id*. at 3:5-9. Thus, even while acknowledging the fraudulent scheme, Dext actively seeks to continue profiting at the expense of Plaintiffs and the putative class.

Plaintiffs' First Amended Complaint ("FAC") asserts two types of liability against Dext: (1) vicarious liability for the unlawful conduct of BTL and MMP under joint venture and agency law; and (2) direct liability for its own unlawful conduct. The FAC thoroughly details the agency and joint-venture relationships among Dext, MMP, and BTL, providing specific factual allegations regarding Dext's control over EFA procurement, MMP's role as Dext's agent, and BTL's participation in the coordinated financing pipeline. The FAC also alleges sufficient facts to establish Dext's direct liability. Therefore, Dext's Motion must be denied in full. Alternatively, if the allegations in the FAC are deemed insufficient, Plaintiffs respectfully request leave to file an amended complaint under Rule 15.

## II.    FACTUAL BACKGROUND

MMP assigned its interest in Plaintiffs' EFAs to other financing companies, including Dext. FAC at ¶¶ 17–19. Dext, however, is not merely a passive assignee. It actively arranges EFAs directly with purchasers of BTL devices and also purchases EFAs by paying MMP a broker fee. *Id*. at ¶¶ 17, 63. Upon assignment, Dext was entitled to collect payments and retained all rights and remedies under the EFAs, including repossession and pursuit of deficiencies. *Id*. at ¶¶ 17–19, 131. Dext enforced these remedies against Plaintiffs, including initiating legal action against Plaintiff King to collect the full balance due even after she returned the financed equipment. *Id.* at ¶¶ 17, 73.

PLAINTIFFS' OPPOSITION TO DEFENDANT DEXT'S MOTION TO DISMISS

Dext operates a sophisticated asset-backed securitization program that fundamentally depends on a steady stream of equipment finance contracts originated from MMP and BTL. Through at least six securitization transactions, Dext has issued in excess of $1 billion in asset-backed securities. Schmidt Decl., at ¶ 6 and Exhibits D & E. These securitizations are backed by "small and middle-ticket healthcare and technology equipment leases and loans," precisely like the loans Plaintiffs and the putative class were induced to sign. *Id*.

This securitization business model reveals the true nature of the relationship between Dext (and Amur and North Mill), MMP, and BTL: they function as interdependent components of an integrated financing operation designed to perpetually generate securitizable assets. MMP and BTL serve as the "front end," originating EFAs through their sales representatives and vendor relationships. *See* Schmidt Decl., at ¶ 7 and Exhibit F (press release from Amur, in which Amur's CEO states "At Amur, we know we can only succeed when our partners do…I would like to express our sincere gratitude to our customers, *origination partners*, investors and bank partners for their faith in us and the critical role that they have played in our success.")(emphasis added). Dext, in turn, provides the capital and the ultimate market for these agreements, purchasing them for inclusion in its asset-backed securities offerings. The entire enterprise is structured to produce a continuous pipeline of equipment finance contracts that can be packaged and sold to institutional investors.

This business model, often described as "originate to distribute," mirrors the structure that fueled the 2008 subprime mortgage crisis. In that crisis, mortgage originators were incentivized by volume over loan quality, generating mortgages without regard for borrowers' ability to repay, knowing those mortgages would be immediately sold off and securitized by Wall Street firms. The originators bore no risk of default, profiting solely from origination fees. Securitizers were similarly indifferent to underwriting standards, merely packaging and selling loans. This separation of origination from risk-bearing created a system where no participant had an incentive to

PLAINTIFFS' OPPOSITION TO DEFENDANT DEXT'S MOTION TO DISMISS

ensure borrowers could afford their obligations, leading to catastrophic consequences.

Defendants have replicated this toxic "originate to distribute" structure in the medical equipment finance industry. MMP and BTL, akin to the mortgage brokers of the mid-2000s, are incentivized to originate as many EFAs as possible using deceptive sales tactics, knowing Dext (and the other financing Defendants) will promptly purchase them for securitization. MMP and BTL are thus insulated from the consequences of predatory origination practices, as they do not hold the loans; Dext does. Dext, in turn, passes the default risk to the institutional investors who purchase its asset-backed securities. This arrangement encourages MMP and BTL to prioritize volume over legitimacy, generating EFAs through deceptive practices targeting borrowers who are often unaware of their obligations. Just as subprime mortgage originators disregarded borrowers' ability to pay, MMP and BTL disregard the legitimacy of the equipment or whether borrowers have been deceived, so long as the paperwork satisfies Dext's securitization requirements.

This arrangement satisfies the hallmarks of both an agency relationship and a joint venture. With respect to agency, MMP and BTL originate EFAs according to Dext's specifications and requirements, ensuring each agreement meets the precise criteria necessary for inclusion in Dext's securitization pools. Dext, therefore, exercises direct control over the essential terms and characteristics of the agreements that MMP and BTL generate, as those agreements must conform to the standards demanded by the asset-backed securities market. MMP and BTL thus act directly for Dext's benefit and subject to Dext's control in originating these financing agreements.

The relationship also constitutes a joint venture. Dext, MMP, and BTL share a common, overarching purpose: the predatory origination and securitization of equipment finance agreements for profit. Each party contributes essential capabilities to this enterprise: MMP and BTL provide origination capabilities and vendor relationships, while Dext provides the capital and access to the lucrative securitization market. The substantial profits generated by this scheme are shared among the participants, with MMP and BTL receiving compensation for originating agreements that Dext then monetizes

through its securities offerings. This mutual stake in the success of the overall operation clearly demonstrates the community of interest characteristic of a joint venture.

## III.    ARGUMENT

### A.    Plaintiffs Adequately Allege Vicarious Liability.

Dext is vicariously liable for the unlawful conduct of BTL and MMP because all three operated as a joint venture and because BTL and MMP acted as Dext's agents in an integrated scheme to generate and securitize equipment finance agreements. Dext's Motion to dismiss Plaintiffs' claims for vicarious liability should therefore be denied.

### 1.    Dext Was in a Joint Venture with MMP and BTL.

Plaintiffs' allegations establish a joint venture between Dext, MMP, and BTL, formed to profit from an integrated "originate-to-distribute" securitization scheme. Dext's argument that it was merely a competitor in the market ignores the reality of its business model. Dext profits by purchasing and securitizing vast quantities of EFAs, including the predatory loans originated by MMP and BTL. This model incentivized MMP and BTL to generate as many EFAs as possible, regardless of borrower creditworthiness or the legitimacy of the underlying transaction, because the risk of default was passed on to Dext and, ultimately, to the investors in its asset-backed securities. This shared enterprise, designed for mutual profit at the expense of small businesses like Plaintiffs, constitutes a classic joint venture.

"A joint venture is an undertaking by two or more persons jointly to carry out a single business enterprise for profit. The necessary elements for its creation are (1) a joint interest in a common business; (2) an understanding to share profits and losses; and (3) a right to joint control. Whether a joint venture exists is a question of fact. The parties may create a joint venture despite an express declaration to the contrary." *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F.Supp.2d 846, 853 (C.D. Cal. 2004) (cleaned up). "Such a venture or undertaking may be formed by parol agreement, or it may be assumed as a reasonable deduction from the acts and declarations of the parties." *Nelson v. Abraham*, 29 Cal.2d 745, 749–50 (1947).

"Each member of a joint venture is the agent of the others in the venture's business transactions." *Cahill Bros. v. Clementina Co.*, 208 Cal. App. 2d 367, 388 (1962). "A principal whose agent has committed a tort in the transaction of the business of the agency is jointly and severally liable to an injured party. Such liability is either predicated upon an act or omission of the agent which the principal directed or in which he participated; or it is imposed, where he did not so direct or participate, simply because of the responsibility cast upon him by law by reason of his relationship to his agent." *Id*.

First, the FAC alleges a joint interest in a common business enterprise: an integrated "originate-to-distribute" scheme centered on the marketing, sale, financing, and ultimate securitization of equipment finance agreements. FAC at ¶¶ 20-22, 33, 60-64. Dext, MMP, and BTL worked in concert to create a pipeline of EFAs that served the ultimate goal of creating asset-backed securities for Dext to sell to investors. BTL sold the equipment, MMP originated the financing, and Dext purchased and packaged the EFAs into securities, earning profits from interest, fees, and the sale of the securities. This shared objective—profiting from the securitization pipeline—demonstrates a clear joint interest in a common business enterprise sufficient to satisfy the first *Celador* element.

Second, the FAC alleges an understanding to share profits and diffuse losses. The profits from the scheme were distributed among the venturers: BTL profited from equipment sales, MMP from broker fees and finance charges, and Dext from finance charges and, most significantly, the profits generated by securitizing the EFAs. FAC at ¶¶ 20-22, 60-63. The structure was designed to diffuse the risk of loss from any single EFA across the entire portfolio of securitized assets, including by utilizing "split" financing to further spread the risk of loss across the joint venturers, thus insulating the originators from the consequences of default and allowing Dext to offload the ultimate risk to its securities investors. This shared interest in the venture's profitability and its structure for managing risk satisfies the second element.

Third, the FAC alleges that Dext, MMP, and BTL exercised joint control over the

7

PLAINTIFFS' OPPOSITION TO DEFENDANT DEXT'S MOTION TO DISMISS

venture. BTL and MMP controlled the "front-end" origination of the EFAs, while Dext exercised control over the "back-end" by setting the parameters for the EFAs it would purchase for securitization. FAC at ¶¶ 61-63, 65-66. Dext's demand for a high volume of contracts for its securitization pools dictated MMP's aggressive, high-risk origination practices. Dext's role was not passive; it directed the flow of EFAs and retained ultimate approval authority, ensuring the agreements met the specifications required for its securities offerings. This interdependence and mutual influence over the core components of the enterprise demonstrate the requisite joint control. *See Orosco v. Sun-Diamond Corp.*, 51 Cal. App. 4th 1659, 1666 (1997) ("the members must have joint control over the venture (even though they may delegate it)").

Accordingly, Plaintiffs have sufficiently alleged the existence of a joint venture between Dext, MMP, and BTL. The determination of whether a joint venture in fact existed is a question of fact that cannot be resolved at the pleading stage. *See Celador*, *supra,* 347 F. Supp. 2d at 854. Dext's motion to dismiss on this ground should therefore be denied.

## 2. The FAC Adequately Alleges Vicarious Liability Under Agency Principles.

Plaintiffs allege that MMP acted as Dext's agent for the purpose of originating EFAs to supply Dext's asset-backed securities business. FAC ¶ 28. Dext executed a broker agreement with MMP, retaining MMP to act for Dext's benefit-sourcing EFAs-and subject to Dext's control, as the EFAs had to conform to the standards of Dext's securitization program. While the broker agreement purports to disclaim an agency relationship, that self-serving declaration is not dispositive where the facts demonstrate otherwise.

Plaintiffs also adequately allege that Dext and BTL had a principal-subagent relationship. Plaintiffs allege that BTL and MMP appeared at the same sales conferences, BTL prepared Plaintiffs' EFA paperwork for MMP, and BTL funneled Plaintiffs to MMP to execute the EFAs, all of which support the reasonable inference that MMP delegated

its powers to BTL and therefore would make BTL Dext's subagent. *See also* Schmidt Decl., at ¶ 8 and Exhibit H (interview with MMP Founder and CEO John-Paul Smolenski in which he states that MMP does "a lot of traveling for trade shows and workshops for [MMP's] key vendor partners, and [MMP is] used to working on the road" and also indicates that financing applications can be approved "in as little as five minutes.").

Plaintiffs have therefore adequately pled that Dext is vicariously liable for BTL and MMP's fraud under joint venture and agency law. FAC at ¶¶ 28–29.

## B.    Plaintiffs Adequately Allege Direct Liability Against Dext

Dext's Motion only seeks to dismiss Plaintiffs' direct liability claims. However, Dext misapplies the law of fiduciary duty and otherwise requests this Court to make factual findings, which are inappropriate for a Rule 12(b)(6) motion to dismiss. The FAC sufficiently alleges claims that Dext is directly liable to Plaintiffs for its own unlawful conduct. Thus, the Court should deny Dext's Motion with respect to all claims of direct liability alleged by Plaintiffs against Dext.

### 1.    Plaintiffs State a Claim for Breach of Fiduciary Duty Against Dext.

Dext is liable for the breaches of fiduciary duty committed by its co-venturers, MMP and BTL. Dext's argument that it owes no duty as a lender is misplaced. The FAC alleges that Dext, MMP, and BTL operated as a joint venture to profit from the securitization of EFAs. FAC at ¶ 29. Partners and joint venturers owe fiduciary duties to one another and are vicariously liable for the torts of their co-venturers committed in furtherance of the venture. *Cochrum v. Costa Victoria Healthcare, LLC*, 25 Cal.App.5th 1034, 1053 (2018). The FAC alleges that MMP and BTL owed and breached fiduciary duties to Plaintiffs and that Dext, as their joint venturer, knew or should have known of this unlawful conduct. FAC at ¶ 90. Accordingly, Dext is vicariously liable for these breaches.

Plaintiffs have adequately alleged that BTL exercised complete dominion and control over the structuring of the EFAs executed by Plaintiffs and therefore developed a

9

fiduciary duty with respect to Plaintiffs. FAC at ¶¶ 60, 64-65 (BTL and MMP worked hand-in-hand to prepare EFAs "without any input from the purchasers or disclosures to them," and "without performing any due diligence to ensure the purchasers were sufficiently credit-worthy"); *see also Title Insurance and Trust Co. v. California Development Co.*, 171 Cal. 173, 205-06 (1915) (where lender exercises complete dominion and control over borrower's business, the lender becomes a fiduciary to the borrower). BTL advised Plaintiffs to their detriment by advising Plaintiffs on financing, submitting their applications to hand-picked lenders, executed EFAs containing onerous and unconscionable terms, all the while Plaintiffs believed BTL and the financing Defendants were helping them through the process. FAC at ¶ 88. Because Dext has subsumed the fiduciary duties of MMP and BTL, it likewise is vicariously liable for Plaintiff's sufficiently pled allegations that MMP and BTL breached that duty and proximately caused damages to Plaintiffs. FAC at ¶¶ 90-92. Accordingly, the FAC adequately alleges facts that, if true, would establish that Dext owed a fiduciary duty to Plaintiffs and therefore Dext's Motion should be denied.

### 2.    Plaintiffs State a Claim for Fraudulent Concealment or Omission Against Dext.

Dext argues that the FAC's Third Cause of Action for Fraudulent Concealment or Omission does not allege any cognizable fraudulent concealment or omission by Dext. Fraudulent concealment requires allegations that: (1) the defendant concealed or suppressed a material fact; (2) the defendant had a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with intent to defraud; (4) the plaintiff was unaware of the fact and would have acted differently if they had known; and (5) the plaintiff suffered damages as a result. *Radus Tek Servs., Inc. v. IDC Techs. Inc.*, 767 F.Supp.3d 972, 982 (N.D. Cal. 2025) (citation omitted). Here, the FAC adequately alleges all five elements.

**First**, the FAC alleges that Dext concealed material facts, including its knowledge of the fraudulent "originate-to-distribute" scheme and MMP's specific fraudulent

PLAINTIFFS' OPPOSITION TO DEFENDANT DEXT'S MOTION TO DISMISS

practices, such as "split" financing. FAC at ¶ 106. Dext's own lawsuit against MMP confirms its awareness that MMP engaged in "a prohibited, unethical practice," yet Dext continues to enforce the EFAs against Plaintiffs. *See* ECF 50-1 at 3:5-9, 4:1-4, and ECF 50-5 at ¶ 12. These allegations establish that Dext concealed material facts that it had a duty to disclose.

**Second**, Dext had a duty to disclose its knowledge of MMP's fraud to Plaintiffs once it became aware of MMP's prohibited conduct. A defendant has a duty to disclose when it: (1) is the plaintiff's fiduciary; or (2) it had exclusive knowledge of material facts not known to the plaintiff in a "seller and buyer" relationship or "parties entering into any kind of contractual agreement." *Deteresa v. Am. Broad. Companies, Inc.*, 121 F.3d 460, 467 (9th Cir. 1997); *see Terpin v. AT And T Mobility LLC*, 118 F.4th 1102, 1110–11 (9th Cir. 2024) (citing *LiMandri v. Judkins*, 52 Cal.App.4th 326 (1997).) As shown above, the FAC adequately alleges facts that, if true, would establish that Dext owed a fiduciary duty to Plaintiffs. In addition, Dext knew that MMP is a serial fraudster who originates unaffordable loans using illegal "split" financing. Dext "knew or should have known" the nature of those accounts, including the frequent "gross" inaccuracies alleged. *Id*.

**Third**, Plaintiffs have alleged the constructive knowledge of Dext of the fraud of its co-Defendants and its entering into financing agreements despite this knowledge of likely fraud.

**Fourth**, Plaintiffs were unaware of the fraudulent nature of the securitization scheme and Dext's role in it. Had they known that their EFAs were being originated through a predatory system designed to feed a securitization machine, without regard for their ability to succeed, they would not have entered into the transactions.

**Finally**, Plaintiffs suffered damages as a direct result of the fraudulent concealment. As the holder and servicer of the EFAs, Dext is the entity that actively enforces the fraudulently obtained debts, extracts monthly payments from Plaintiffs, and sues them for non-payment, causing direct financial harm. FAC at ¶ 115.

Moreover, the FAC adequately alleges the "who, what, when, where, and how" of

the fraudulent concealment. *See Terpin*, *supra,* 118 F.4th at 1112. **Who**: Dext, including by and through its agents and coconspirators. FAC at ¶¶ 17-19, 28, 29. **What**: knowingly entering into and collecting on financing agreements based on a known pattern of deception with a known fraudster, to Plaintiffs' detriment. *Id*. at ¶¶ 5, 106, & 138. **When**: On or about October 2022 (King) and October-December 2022 (Tabiza). *Id*. at ¶ 17-18. **Where**: Los Angeles County, California. *Id*. at ¶ 17. **How**: By entering into finance agreements involving a known fraudster and based on deception of which Dext was at least constructively aware. *Id*. at ¶ 5, 106, & 138.

Dext also argues that the FAC fails to sufficiently allege causation. However, the FAC alleges that Dext's "concealment and omissions were material because they directly impacted Plaintiffs' … decisions to purchase the devices and commit to financing agreements based on false promises." FAC at ¶ 105. The FAC further alleges that Plaintiffs were "deceived and induced into entering equipment financing agreements with the financer for their purchase transaction, including Defendants … DEXT with no disclosure to them of the financer's relationship to BTL and no knowledge that the financing approval was made possible through Defendants' fraud." *Id*. at ¶ 79.

Finally, the FAC alleges that Dext's "concealment and omissions were material because they directly impacted Plaintiffs' … decisions to purchase the devices and commit to financing agreements based on false promises." *Id*. ¶ 105. Plaintiffs, as reasonable businesspeople, would not enter into six-figure loan agreements with MMP if Dext shared its unique insider knowledge that MMP is a serial fraudster ***with regard to such transactions***. The FAC's allegations, especially when given the benefit of necessary inferences, sufficiently allege causation. Accordingly, the FAC adequately alleges facts that if true would establish that Dext fraudulently concealed material facts from Plaintiffs and therefore Dext's Motion should be denied.

### 3.    Plaintiffs State a Claim for Dext's Direct Liability for Breach of Contract and Failure of Consideration

Although Plaintiff's Seventh Cause of Action is titled as "Breach of Contract and

Failure of Consideration," the critical language in paragraph 131 of the FAC is that Plaintiffs allege that the EFAs were "*lacking* consideration" due to their illusory nature. FAC at ¶ 131. The FAC alleges:

> The Equipment Financing Agreements entered into between Plaintiffs and Defendants contain terms rendering the contracts illusory and thus lacking consideration. For example, one such agreement contains the provision: "Creditor may renew, extend or otherwise change the terms of the EFA without notice to you and you will be bound by such changes, and you will pay all of Creditor's costs of enforcement and collection, including [reasonable] attorneys' fees." Because only one party is bound by the terms of the contract, and those terms may be altered unilaterally by the other party, there is insufficient consideration to render the Equipment Financing Agreements enforceable.

*Id.*

Thus, rather than alleging that Dext has breached a term of the EFA, Plaintiffs allegations are that the EFA was never enforceable, and Dext's actions to enforce the EFA were therefore unlawful, because the EFA lacked consideration.

Dext does not dispute that unilateral modification without notice would render the agreements illusory. Nor could they. Under long-established law a contract is void for lack of mutual consideration when one of the promises "leaves a party free to perform or to withdraw at its unrestricted pleasure." *Mattei v. Hopper*, 51 Cal. 2d 119, 122 (1958); see *J. C. Millett Co. v. Park & Tilford Distillers Corp.*, 123 F. Supp. 484, 493 (N.D. Cal. 1954) (same). Accordingly, the FAC adequately alleges facts that if true would establish that the EFAs contain terms rendering the contracts illusory and thus lacking consideration, making them unenforceable and subject to rescission.

### 4.    Plaintiffs State a Claim that Dext Violated the UCL

Dext argues that the FAC's Eighth Cause of Action for violation of the UCL fails to adequately allege that it violated the UCL. The UCL "does not proscribe specific

PLAINTIFFS' OPPOSITION TO DEFENDANT DEXT'S MOTION TO DISMISS

activities, but broadly prohibits 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.'" *Boschma v. Home Loan Ctr., Inc.*, 198 Cal. App. 4th 230, 251 (2011). The UCL governs "anti-competitive business practices" as well as injuries to consumers and has as a major purpose "the preservation of fair business competition." *Id*. By proscribing "any unlawful" business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable. *Id*. "Because ... section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Id*. In other words, a practice is prohibited as "unfair" or "deceptive" even if not "unlawful" and vice versa. *Id*.

### a.    Plaintiffs State a Claim Under the "Unlawful" Prong

The FAC alleges that Dext has violated "various" California laws (FAC at ¶ 147), that the loans (purchased and approved by Dext) (*id*. at ¶ 91) are "unlawful" (*id*. at ¶ 147), and that "DEXT ha[s] unfairly reaped substantial gains through servicing loans knowingly obtained through unlawful means." *Id*. at ¶ 147. That gives us three allegations of unlawful conduct, specific to Dext, alleged in just a single paragraph. Additionally, the FAC sets forth allegations of common law and statutory fraud. *Id*. at ¶¶ 94-110.

Additionally, Dext's entire argument in this section consists of claims that only the *other* Defendants broke the law, but Dext's own unlawful conduct is independently pled. The FAC alleges that Dext knowingly created, accepted, and enforced EFAs that were procured through fraudulent "split" transactions and unlawful sales practices, bringing Dext within the scope of the UCL's "unlawful" prong. This aligns with the UCL's incorporation of predicate violations, which "borrows violations of other laws and treats them as violations of the UCL." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 180 (1999). The violations here include statutory fraud and deceptive financing practices, and the knowing enforcement of agreements obtained through unlawful means. Dext's contentions that Plaintiffs only contacted representatives

PLAINTIFFS' OPPOSITION TO DEFENDANT DEXT'S MOTION TO DISMISS

of BTL and MMP, and that Dext itself was deceived by MMP, are not accurate as Plaintiff King executed an EFA directly with Dext. FAC at ¶ 17. Furthermore, even as to the assigned EFA, Dext is not absolved of the harm caused by its association with its co-Defendants and its knowing enforcement of fraudulent contracts even after accusing MMP of wrongdoing.

### b.     Plaintiffs State a Claim Under the "Unfair" Prong

Dext exploited its information advantage, knowingly accepting and enforcing EFAs procured through MMP's fraudulent 'split' transactions, which artificially qualified borrowers for financing. This conduct was central to Dext's business model, as it profited by originating and securitizing these high-risk EFAs into asset-backed securities, shifting the inherent risks onto investors while generating substantial revenue from the fraudulent scheme. The EFAs Dext directly initiated with BTL likewise contain unlawful and unfair provisions, demonstrating a consistent pattern of conduct designed to feed the securitization pipeline. California's "unfair" prong is broad, and courts have found unfair business practices where a financing company uses deceptive or coercive practices, particularly when the company enforces agreements that were originated through fraud or concealed risks. *See Donadio v. Hyundai Motor Am.,* 751 F.Supp.3d 1013, 1021-23 (C.D. Cal. 2024) (recognizing all three UCL "unfair" tests – the balancing test, the tethering test, and the Section 5 test, and explaining that a practice is "unfair" when consumer harm outweighs any utility, violates a clear public policy, or causes substantial unavoidable injury).

Dext argues that a claim based on the unfair prong of the UCL must be "tied to some legislative policy, or if the harm to consumers outweighs the utility of the challenged conduct. Motion at 21 (citing *Garcia v. Sony Computer Entm't Am., LLC*, 859 F.Supp.2d 1056, 1061-63 (N.D. Cal. 2012). However, the UCL is more nuanced. As "[t]he California Supreme Court has explained there are currently three tests for what constitutes an unfair practice: the "balancing" test, the "tethering" test, and the "section 5 test."" *Hughes v. Apple, Inc.*, No. 22-CV-07668-VC, 2024 WL 4828072, at *4 (N.D.

Cal. Nov. 18, 2024) (citation omitted).

The "balancing test" simply balances the harm of the unfair practice against its justifications. *Donadio*, *supra*, 751 F.Supp.3d at 1022. Dext fails to make any argument under the balancing test, but the FAC clearly alleges both the harms of Dext's conduct and the absence of justification therefore. FAC at ¶¶ 101, 108, 122, 128, 139, & 174.

Similarly, the "Section Five" test requires (1) substantial consumer injury, (2) which is not outweighed by countervailing benefits to consumers or competition; (3) that could not reasonably be avoided by consumers themselves. *Donadio v. Hyundai Motor Am.*, 751 F. Supp. 3d 1013, 1023 (C.D. Cal. 2024) (citation omitted). Dext makes no argument that it is not liable under the "Section Five" test, but the FAC clearly alleges substantial consumer injury (oppressive and dangerous loans, deceptively sold), lack of justification for the practices, and the inability of plaintiffs to avoid the harm.

Dext argues that Plaintiffs only had direct contact during the execution of the EFAs with BTL and MMP, and that Dext itself was deceived. This is blatantly false as Dext worked directly with BTL to execute the King EFA. FAC at ¶ 17. Further, Dext's own lawsuit against MMP shows that it did, in fact, have knowledge that it was engaged with a serial fraudster, yet continued to enforce the EFAs that it purchased from MMP.

### c.   Plaintiffs State a Claim Under the "Fraudulent" Prong

A claim based upon the fraudulent business practice prong is distinct from common law fraud. *Boschma*, 198 Cal.App.4th at 251. A common law fraudulent deception must actually be false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages, but none of these elements are required to state a claim for relief under the UCL. *Id*. A fraudulent business practice under the UCL may be accurate on some level but will nonetheless tend to mislead or deceive. *Id*. Under this prong, the question is not whether Plaintiffs relied on or were actually deceived by Dext's conduct, but whether members of the public are likely to be misled. *In re Tobacco II,* 46 Cal.4th 298 (2009).

Here, the FAC alleges that "DEXT… knew or should have known that BTL was

supplying them with falsified or otherwise grossly inaccurate data and financial documents in order to secure loans" and that "DEXT also knew or should have known that the terms of these loans were materially misrepresented to Plaintiffs at the time they were signed." FAC at ¶ 5. Plaintiffs explicitly allege that "BTL worked hand-in-hand with private equipment financing companies to arrange for equipment financing agreements for its customers … without any input from the purchasers or disclosures to them, which included the payment of kickbacks to Defendant BTL by the financing companies." *Id*. at ¶ 60. These allegations sufficiently allege that Dext engaged in a fraudulent business practice because its conduct, including knowingly accepting and enforcing transactions procured through falsified information, was likely to mislead consumers. Dext's decision to continue partnering with MMP despite knowing about the falsified data and misrepresented loan terms satisfies the UCL's fraudulent prong standard, as it involves representations that "tend to mislead or deceive." Dext's own Motion states that it **knew** that MMP was engaging in fraud, yet it saw a chance to make a dollar by doing business with MMP, without regard to the risks to Plaintiffs. Accordingly, the FAC adequately alleges facts that, if true, would establish that Dext violated the UCL, and Dext's Motion should be denied.

### 5.  Plaintiffs State a Claim for Rescission Against Dext.

Dext's assertion that Plaintiffs' rescission claim lacks alleged wrongdoing by Dext is incorrect. As detailed throughout this Opposition, Plaintiffs have alleged multiple independent grounds for rescission, including fraud, misrepresentation, and failure of consideration, which are expressly recognized grounds under Cal. Civ. Code § 1689 and pled in the complaint. These grounds are directly linked to the underlying fraudulent scheme, perpetuated by Dext, MMP, and BTL, which was designed to generate a continuous supply of securitizable, high-risk EFAs. FAC at ¶¶ 5, 60, 7, 103, 135, 106, 130-31, & 147. The contractual claims and supporting facts, if true, unequivocally establish the right to rescind the EFAs. Additionally, rescission is recognized as a cause of action under California law. *See, e.g., Marzec v. California Public Employees*

*Retirement System*, 236 Cal.App.4th 889, 914 (2015)("[W]e conclude that plaintiffs have stated a cause of action for rescission."). Accordingly, the FAC adequately pleads a rescission claim, and Dext's Motion should be denied.

### 6.    The FAC is Not an Improper Collateral Attack on a Prior Judgment

Dext argues that Plaintiff King and Cosmo Contour's claims are precluded by a judgment entered against them in Oregon. This argument fails for several reasons.

### a.    The Oregon Judgment was a Default Judgment that Did Not Adjudicate Plaintiff's Claims.

On December 20, 2024, Dext obtained a default judgment against King and Cosmo Contour. However, a default judgment does not constitute an adjudication on the merits of the claims now asserted by Plaintiffs in this action. Default judgments have limited preclusive effect because the issues resolved in such judgments are not "actually litigated." As the Ninth Circuit has explained, "a default judgment is generally not entitled to [issue preclusion] because there is no actual litigation of the issues." *In re Palmer*, 207 F.3d 566, 568 (9th Cir. 2000). The Supreme Court has similarly recognized that "[i]n the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of [issue preclusion] does not apply with respect to any issue in a subsequent action." *Arizona v. California*, 530 U.S. 392, 414 (2000) (quoting Restatement (Second) of Judgments § 27, cmt. e).

Under California law, "[a] default judgment is res judicata as to all issues aptly pleaded in the complaint, and defendant is estopped from denying in a subsequent action any allegations contained in the former complaint," but "such judgment is not conclusive as to any defense or issue which was not raised and is not necessary to uphold the judgment." *Mitchell v. Jones*, 172 Cal.App.2d 580, 586 (1959) (quoting *Fitzgerald v. Herzer*, 78 Cal.App.2d 127, 132 (1947)). Here, the Oregon collection action addressed only whether Plaintiffs owed money to Dext under the EFA. It did not and could not adjudicate Plaintiffs' fraud, breach of fiduciary duty, and other affirmative claims.

1

2

               **b.**     **The Jurisdictional Competency Exception Bars Claim**
                    **Preclusion.**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

     Even if claim preclusion otherwise applied, Plaintiffs' claims fall within the well-established jurisdictional competency exception. The Supreme Court has held that "claim preclusion generally does not apply where "[the] plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy because of the limitations on the subject matter jurisdiction of the courts." *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 382 (1985) (quoting Restatement (Second) of Judgments § 26(1)(c)). The Court explained that "[i]f state preclusion law includes this requirement of prior jurisdictional competency, which is generally true, a state judgment will *not* have claim preclusive effect on a cause of action within the exclusive jurisdiction of the federal courts." *Id*. (emphasis in original). The Ninth Circuit has consistently applied this exception. *See Feminist Women's Health Center v. Codispoti*, 63 F.3d 863, 869 (9th Cir. 1995); *Harris v. County of Orange*, 682 F.3d 1126, 1133 (9th Cir. 2012) ("claim preclusion did not bar [plaintiffs'] second action for damages where a damages remedy was unavailable in the first action."). California courts similarly recognize the exception. *Guerrero v. Department of Corrections & Rehabilitation*, 28 Cal.App.5th 1091, 1103-04 (2018) ("[T]his exception has been recognized in both federal law and California law.").

19

20

21

22

23

24

     Here, Plaintiffs' claims under California's Unfair Competition Law, False Advertising Law, and other California consumer protection statutes could not have been asserted as defenses or counterclaims in the Oregon collection action. An Oregon court applying Oregon law to a simple contract collection matter would not have had jurisdiction to adjudicate Plaintiffs' affirmative claims arising under California statutory law. Plaintiffs are therefore entitled to pursue those claims in this forum.

25

26

               **c.**     **Fraud Vitiates Judgments Obtained Through Fraudulent**
                    **Means.**

27

28

     To the extent the Oregon judgment was obtained through enforcement of contracts that were themselves procured through fraud, Plaintiffs are entitled to challenge that

judgment. The FAC alleges that Defendants engaged in fraudulent conduct, including BTL and MMP supplying falsified or grossly inaccurate data and financial documents in order to secure loans for Plaintiffs, and that Dext knew or should have known of this misconduct. FAC at ¶¶ 5, 98, 106, & 138. If these allegations are proven, the contracts upon which the Oregon judgment rests are voidable, and the judgment itself may be subject to collateral attack.

### d.    Full Faith and Credit Does Not Extend the Oregon Judgment Beyond Its Proper Scope.

Under 28 U.S.C. § 1738, federal courts must give state court judgments "the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." *Marrese*, *supra*, 470 U.S. at 380 (quoting 28 U.S.C. § 1738). However, as the Ninth Circuit has explained, "[w]e need not give a state court decision preclusive effect, for example, where the state court 'did not have jurisdiction over the subject matter or the relevant parties' and the question of jurisdiction was not litigated in the state court." *Los Altos El Granada Investors v. City of Capitola*, 583 F.3d 674, 687 (9th Cir. 2009) (quoting Underwriters Nat'l Assurance Co. v. N.C. Life & Accidental Health Ins. Guar. Ass'n, 455 U.S. 691, 704-05 (1982)).

This action seeks to vindicate the rights of a class of consumers who were victimized by Defendants' fraudulent scheme. Allowing Dext to use a default judgment obtained in a collection action, filed in a distant forum pursuant to a forum selection clause in a contract of adhesion, to shield itself from liability for its own misconduct would undermine the public policies underlying California's consumer protection laws. The Court should reject Dext's attempt to use the Oregon judgment as a sword to defeat Plaintiffs' claims.

### 7.    The Contractual Waivers of Defenses Cannot be Enforced as the Contracts are Illusory.

Dext argues that Plaintiffs contractually agreed not to assert any claims or defenses against Dext. This argument fails for multiple reasons.

PLAINTIFFS' OPPOSITION TO DEFENDANT DEXT'S MOTION TO DISMISS

As a threshold matter, Dext's reliance on the contractual waiver provisions constitutes an affirmative defense that cannot properly be resolved on a motion to dismiss. The Ninth Circuit has made clear that "[d]ismissal under Rule 12(b)(6) on the basis of an affirmative defense is proper only if the defendant shows some obvious bar to securing relief on the face of the complaint." *Asarco, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014). Critically, "[i]f, from the allegations of the complaint as well as any judicially noticeable materials, an asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper." *Id*. "[O]nly when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." *Jensen v. Brown*, 131 F.4th 677, 687 (9th Cir. 2025) (quoting *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 603 n.8). Here, the enforceability of the waiver provisions raises disputed factual issues, including whether the contracts were procured through fraud and whether Dext satisfies the statutory requirements for enforcement under UCC § 9-403.

Even if the Court were to consider Dext's affirmative defense, the waiver provisions are unenforceable because the FAC alleges that the Equipment Finance Agreements were procured through fraud and misrepresentation, making them unconscionable. As the California Court of Appeal explained in *McClain v. Octagon Plaza, LLC*, "a party to a contract who has been guilty of fraud in its inducement cannot absolve himself or herself from the effects of his or her fraud by any stipulation in the contract, either that no representations have been made, or that any right that might be grounded upon them is waived. Such a stipulation or waiver will be ignored ... for the reason that fraud renders the whole agreement voidable, *including the waiver provision*." 159 Cal.App.4th 784, 800 (2008) (emphasis in original) (quoting 1 Witkin Summary of Cal. Law (10th ed. 2005) Contracts, § 304, p. 330). *See also Manderville v. PCG&S Group, Inc.*, 146 Cal.App.4th 1486, 1501 (2007) ("Because the fraud renders the entire contract voidable, the clause intended to absolve the seller from liability is also voidable."). The FAC alleges that BTL and MMP, acting as Dext's agents, fraudulently

induced Plaintiffs to enter into the EFAs, a critical component of the securitization scheme. FAC at ¶¶ 5, 28, 90, 98, 103-109, and 138. If proven, these waiver provisions are voidable, unconscionable, and unenforceable.

Moreover, California courts have held that contractual waivers do not extend to equitable defenses such as fraud, particularly when such waivers are obtained through the predatory practices inherent in the securitization-driven scheme. In *California Bank & Trust v. DelPonti*, the court held that "[a] guarantor's waiver of defenses is limited to legal and statutory defenses expressly set out in the agreement. A waiver of statutory defenses is not deemed to waive all defenses, *especially equitable defenses*, such as unclean hands, where to enforce the guaranty would allow a lender to profit by its own fraudulent conduct." 232 Cal.App.4th 162, 167 (2014). The court emphasized that "public policy requires [the Court of Appeal] to read Civ. Code, § 2856, in a manner that would prevent the bank from capitalizing upon its own fraud or willful misconduct." *Id*. at 168. Additionally, California Civil Code § 1668 provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud ... are against the policy of the law." The waiver provisions cannot be enforced to exempt Dext from responsibility for its own fraud and that of its agents in orchestrating the asset-backed securities scheme.

Finally, Dext cites California Commercial Code § 9403 for the proposition that waiver of defenses clauses are enforceable. However, under § 9403(b), such clauses are enforceable only if the assignment is taken in good faith and without notice of defenses. The FAC alleges that Dext knew or should have known about the fraudulent scheme. FAC at ¶¶ 5, 90, 106, & 138. Whether Dext took its assignment "in good faith" and "without notice" presents disputed factual issues. Moreover, fraud in the inducement remains a valid defense even under UCC § 9-403. *See Wells Fargo Bank Minnesota, N.A. v. B.C.B.U.*, 143 Cal.App.4th 493, 504 (2006). Accordingly, the Court should reject Dext's contractual waiver argument.

PLAINTIFFS' OPPOSITION TO DEFENDANT DEXT'S MOTION TO DISMISS

### 8.    Dext is a Required Party Under Rule 19.

Even if the Court were inclined to grant dismissal on any ground, Dext is a required party under Federal Rule of Civil Procedure 19 and cannot be dismissed from this action. Rule 19(a)(1) provides that a party must be joined if feasible when:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

### a.    Complete Relief Requires Dext's Presence.

Dext holds Plaintiffs King and Tabiza's EFAs. If Dext is dismissed, Plaintiffs cannot obtain complete relief on their claims for rescission of those agreements. If Dext is not a party, any judgment rescinding the agreements would not be binding on Dext, and Plaintiffs would remain obligated to Dext, depriving them of complete relief.

### b.    Dext's Interests Would Be Impaired by Its Absence.

Dext has direct financial interests in the EFAs at issue, stemming from its central role in originating, purchasing, and securitizing these agreements for profit in the asset-backed securities market. If the Court rules that the agreements were procured through fraud and therefore unenforceable as to the other defendants, Dext's interests in its entire securitization portfolio would be directly affected. Dext would have no opportunity to defend against findings that implicate its own agreements and business model.

### c.    Inconsistent Obligations Would Result Without Dext.

The integrated nature of the alleged fraudulent scheme, spanning from loan origination by MMP and BTL to Dext's purchase and securitization of EFAs, means that rulings against some defendants will necessarily implicate others. If BTL and MMP are found liable for fraud, and Dext's agreements are a product of that fraud and part of its

securitization chain, the remaining defendants would face claims for contribution or indemnification. Dext's absence would create a substantial risk of inconsistent obligations, undermining the ability to provide comprehensive relief.

## IV.    CONCLUSION

The FAC alleges that Dext is vicariously liable to Plaintiffs for BTL's and MMP's unlawful conduct under joint venture and agency principles. Dext does not meaningfully challenge those allegations. Accordingly, Dext's Motion should be denied with respect to the Plaintiffs' vicarious liability claims. The FAC also alleges that Dext is directly liable for its own unlawful conduct. Those allegations independently state viable claims against Dext. Accordingly, Dext's Motion should therefore be denied with respect to the Plaintiffs' claims of Dext's direct liability. For the foregoing reasons, Dext's Motion should be denied in its entirety. Should the Court grant Dext's Motion in any respect, Plaintiffs respectfully request leave to amend.

Respectfully submitted,

Date: February 16, 2026                **HAINES LAW GROUP, APC**

By: */s/ Fletcher W. Schmidt*
     Fletcher W. Schmidt, Esq.
     *Counsel for Plaintiffs*
     *and the Proposed Class*

PLAINTIFFS' OPPOSITION TO DEFENDANT DEXT'S MOTION TO DISMISS